McGAHEY *v.* VIRGINIA.

BRYAN *v.* VIRGINIA.

COOPER *v.* VIRGINIA.

ELLETT *v.* VIRGINIA.

CUTHBERT *v.* VIRGINIA.

ERROR TO THE SUPREME COURT OF APPEALS OF THE STATE OF VIRGINIA.

IN RE BROWN.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF VIRGINIA.

HUCLESS *v.* CHILDREY.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF VIRGINIA.

VASHON *v.* GREENHOW.

ERROR TO THE SUPREME COURT OF APPEALS OF THE STATE OF VIRGINIA.

Nos. 1057, 1055, 1056, 1058, 1142, 1217, 1216, 23. Argued January 21, 1890. — Decided May 19, 1890.

The decisions *Hartman* v. *Greenhow,* 102 U. S. 672; *Antoni* v. *Greenhow,* 107 U. S. 769; *Virginia Coupon Cases,* 114 U. S. 269; *Barry* v. *Edmunds,* 116 U. S. 550; *Chaffin* v. *Taylor,* 116 U. S. 567; *Royall* v. *Virginia,* 116 U. S. 572; *Sands* v. *Edmunds,* 116 U. S. 585; *Royall* v. *Virginia,* 121 U. S. 102; *In re Ayers, In re Scott* and *In re McCabe,* 123 U. S. 443, are reviewed; and, without committing the court to all that has been said, or even all that has been adjudged in those cases, on the subject of the act of the legislature of Virginia of March 30, 1871, to provide for the funding and payment of the public debt, and the issue of coupon bonds of the State under its provisions, it is now *Held,*

(1) That the provisions of the act of 1871 constitute a contract between the State of Virginia and the lawful holders of the bonds and coupons issued under and in pursuance of said statute;

(2) That the various acts of the assembly of Virginia passed for the purpose of restraining the use of said coupons for the payment of taxes and other dues to the State, and imposing impediments and obstructions to that use, and to the proceedings instituted for

establishing their genuineness, do in many respects materially impair the obligation of that contract, and cannot be held to be valid or binding in so far as they have that effect;

(3) That no proceedings can be instituted by any holder of said bonds or coupons against the Commonwealth of Virginia, either directly by suit against the Commonwealth by name, or indirectly against her executive officers to control them in the exercise of their official functions as agents of the State;

(4) That any lawful holder of the tax-receivable coupons of the State issued under the act of 1871 or the subsequent act of 1879, who tenders such coupons in payment of taxes, debts, dues and demands due from him to the State, and continues to hold himself ready to tender the same in payment thereof, is entitled to be free from molestation in person or goods on account of such taxes, debts, dues or demands, and may vindicate such right in all lawful modes of redress — by suit to recover his property, by suit against the officer to recover damages for taking it, by injunction to prevent such taking where it would be attended with irremediable injury, or by a defence to a suit brought against him for his taxes or the other claims standing against him; that no conclusion short of this can be legitimately drawn from the series of decisions reviewed by the court without wholly overruling that rendered in the *Coupon Cases* and disregarding many of the rulings in other cases, which the court would be very reluctant to do; and that to this extent the court feels bound to yield to the authority of its prior decisions whatever may have been the former views of any member of the court.

In *McGahey* v. *Virginia*, *Bryan* v. *Virginia* and *Cooper* v. *Virginia* it is now *Held*,

(1) That the provision in the act of the General Assembly of Virginia of January 26, 1886, which imposes upon the taxpayer the duty of producing the bond from which the coupons tendered by him in payment of taxes were cut, at the time of offering the coupons in evidence in court, is an unreasonable condition, in many cases impossible to be performed, so onerous and impracticable as not only to affect, but to destroy the value of the instruments in the hands of the holder who had purchased them; and is repugnant to the Constitution of the United States;

(2) That the provision in the act of that Assembly of January 21, 1886, which prohibits expert testimony in establishing the genuineness of coupons so offered in evidence, is in like manner unconstitutional;

(3) That it is questionable whether the act of that assembly of May 8th, 1887, which authorizes and requires a suit to be brought against the taxpayer who tenders payment of his taxes in coupons, as well as the acts which require their rejection, are not laws impairing the obligation of the contract.

In *Ellett* v. *Virginia* it is *Held;* that in tendering coupons in payment of a

judgment recovered by the State for taxes and costs of suit the taxpayer is entitled to tender coupons in payment of the costs as well as of the taxes.

In *Cuthbert* v. *Virginia* it is *Held;* that the special license required by the act of March 15, 1884, as amended by the act of May 23, 1887, for the right to offer tax-receivable coupons for sale was a material interference with their negotiability, and impaired the contract.

In *Brown's Case* it is *Held;* that whether the passage of a new statute of limitations, giving a shorter time for the bringing of actions than had existed before, as applied to actions which had accrued, so affected the remedy as to impair the obligations of the contract, within the meaning of the Constitution, depends upon whether a reasonable time is given for bringing such actions; that no one rule can be laid down for determining, as to all cases alike, whether the time allowed was or was not reasonable; that that fact must depend upon the circumstances in each case; and that under the circumstances of this case, and the peculiar condition of the securities in question, the limitation prescribed by § 415 of the Code of Virginia of 1887, with regard to the obligations of the State is unreasonable and impairs the obligation of the contract.

In *Hucless* v. *Childrey* it is *Held;* that the requirement by the laws of Virginia that the tax for a license to sell, by retail, wine, spirits and other intoxicating liquors shall be paid in lawful money of the United States does not impair the obligation of the contract made by the State with the holders of the coupons of its bonds, that they shall be received in payment of taxes.

In *Vashon* v. *Greenhow* it is *Held,* that the statute of Virginia requiring the school tax to be paid in lawful money of the United States was valid, notwithstanding the provision of the act of 1871, and was not repugnant to the Constitution of the United States.

THESE cases, all of which grew out of the legislation of the State of Virginia regarding its tax-receivable coupons, were argued together; and, although having distinguishing features, it has been found by the court more convenient to treat them together in its opinion.

MR. JUSTICE BRADLEY, on behalf of the court, prefaced the cases in detail, by a general review of the previous action of the court in this matter. He said :

These cases, like the *Virginia Coupon Cases*, decided in April, 1885, and reported in 114 U. S. 269, and like *Barry* v. *Edmunds* and other cases argued at the same time, decided in February, 1886, and reported in 116 U. S. 550, etc., arise upon certain tax-receivable coupons attached to bonds of the State

of Virginia issued in reduction and liquidation of the state debt under the acts of March 30, 1871, and March 28, 1879. The present appeals are a continuation of the controversy arising upon said coupons as receivable and tendered in payment of taxes and other state dues.

The origin of these bonds and coupons has been fully explained in former cases; but the proper disposition of the cases now to be considered will be greatly facilitated by presenting a connected *résumé* of the legislative acts relating to and affecting the said securities, and of the decisions heretofore made in reference to said acts.

The state debt of Virginia amounted, prior to the late civil war, to more than thirty millions of dollars. After the war it became a matter of great importance to arrange this debt in such manner as to bring it within the control and means of the State. West Virginia had recently been separated from the parent State and had participated in the advantages of the money raised by the issue of the state securities. It was supposed by those who were best qualified to know the facts that at least one-third of the state resources was lost by this excision of territory, and the legislature of Virginia deemed it nothing more than equitable that the new State should bear one-third of the state debt. A proposition was therefore made to the bondholders of the State to receive two-thirds of the amount due them in new bonds payable thirty-four years after date, with coupons attached thereto receivable, after becoming due, in payment of taxes and other claims and demands due to the State. This scheme was formulated by the act of March 30, 1871, entitled "An act to provide for the funding and payment of the public debt," and was acquiesced in by the public creditors, or the great majority of them, who accepted and received the bonds provided for in the act, which were looked upon as a favorite security in consequence of the value attached to the coupons as legal tender instruments in the payment of taxes and public dues. The act, amongst other things, provided as follows:

"SECTION 2. The owners of any of the bonds, stocks or interest certificates heretofore issued by this State which are recog-

nized by its constitution and laws as legal" [except certain specific securities named] "may fund two-thirds of the amount of the same, together with two-thirds of the interest due or to become due thereon to the first day of July, 1871, in six per centum coupon or registered bonds of this State . . . to become due and payable in thirty-four years after date, but redeemable . . . after ten years, the interest to be payable semi-annually on the first days of January and July in each year. The bonds shall be made payable to order or bearer and the coupons to bearer, and registered bonds payable to order may be exchanged for bonds payable to bearer, and registered bonds may be exchanged for coupon bonds, or *vice versa*, at the option of the holder. The coupons shall be payable semi-annually, and be receivable at and after maturity for all taxes, debts, dues and demands due the State, which shall be expressed on their face. . . ."

Provision was made in the third section of the act for the issue of certificates for one-third part of the debt which was not funded in said bonds, the payment of which certificates it was declared would be provided for in accordance with such settlement as should thereafter be had between the States of Virginia and West Virginia in regard to the public debt of the State existing at the time of its dismemberment.

By the fourth section the treasurer was authorized and directed to cause to be prepared engraved or lithographed, registered bonds and bonds with coupons, and certificates of the character mentioned in the second and third sections, and, when prepared, to commence the issuance of the same. It was further enacted that the bonds and certificates should be signed by the treasurer and countersigned by the auditor; that the coupons should be signed by the treasurer, or that a *fac simile* of his signature should be stamped or engraved thereon. The bonds were to be issued in series, and those of each series to be numbered from one upwards, as issued, and the coupons, in addition to the number of the bond to which they were attached, were to be numbered from one to sixty-seven. The surrendered bonds were to be cancelled and deposited in the office of the state treasurer.

By section 5 certain assets belonging to the State, when realized or converted into money, were to be paid into the treasury to the credit of a sinking fund created for the purchase and redemption of the bonds issued under the act, and, after 1880, inclusive, a tax of two cents on a hundred dollars of the assessed valuation of all property in the State was to be applied in like manner. The treasurer, the auditor of public accounts and second auditor were appointed commissioners of the sinking fund.

It has always been contended on the part of the bondholders that this statute created a contract between them and the State, firm and inviolable, which the legislature had no constitutional right to violate or impair; and such was, for several years, the uniform holding of the Supreme Court of Appeals of Virginia. See *Antoni* v. *Wright,* 22 Grattan, 833, November term, 1872; *Wise* v. *Rogers,* 24 Grattan, 169; *Clarke* v. *Tyler,* 30 Grattan, 134. A different view, however, has since been taken by the Court of Appeals, which now holds that the act of 1871 was unconstitutional from its inception, being repugnant to certain provisions of the constitution of the State adopted in 1869. An elaborate argument to this effect is contained in the opinion of the court rendered in one of the cases now before us, *Vashon* v. *Greenhow,* decided January 14, 1886. In ordinary cases the decision of the highest court of a State with regard to the validity of one of its statutes would be binding upon this court; but where the question raised is whether a contract has or has not been made, the obligation of which is alleged to have been impaired by legislative action, it is the prerogative of this court, under the Constitution of the United States and the acts of Congress relating to writs of error to the judgments of state courts, to inquire, and judge for itself, with regard to the making of such contract, whatever may be the views or decisions of the state courts in relation thereto.

The decisions of this court, therefore, in reference to the question whether a valid contract was made by the statute in question between the State of Virginia and the holders of the bonds authorized by said act, are to be considered as binding

upon us, although a contrary view may have been taken by the courts of Virginia; and in view of this principle of constitutional law, and of the decisions made by this court, we have no hesitation in saying that the act of 1871 was a valid act, and that it did and does constitute a contract between the State and the holders of the bonds issued under it, and that the holders of the coupons of said bonds, whether still attached thereto or separated therefrom, are entitled, by a solemn engagement of the State, to use them in payment of state taxes and public dues. This was determined in *Hartman* v. *Greenhow*, 102 U. S. 672, decided in January, 1881 ; in *Antoni* v. *Greenhow*, 107 U. S. 769, decided in March, 1883 ; in the *Virginia Coupon Cases*, 114 U. S. 269, decided in April, 1885 ; and in all the cases on the subject that have come before this court for adjudication. This question, therefore, may be considered as foreclosed and no longer open for consideration. It may be laid down as undoubted law that the lawful owner of any such coupons has the right to tender the same after maturity in absolute payment of all taxes, debts, dues and demands due from him to the State. The only question of difficulty which can arise in any case is as to the mode of relief which the owner of such coupons is entitled to in case they are refused when properly tendered in making his payment, or, as to the cases which may be excepted from the operation of his right.

For, almost from the start, the legislature of Virginia has from time to time enacted various laws calculated to embarrass the holders of said coupons in the free use of them for the payment of taxes and other dues. As early as March, 1872, an act was passed prohibiting the officers charged by law with the collection of taxes from receiving in payment anything else than gold and silver coin, United States Treasury notes, and notes of the national banks, and repealing all other acts inconsistent therewith. This law was under consideration in the case of *Antoni* v. *Wright*, 22 Grattan, 833, before referred to, and the Supreme Court of Appeals of Virginia decided that in issuing these bonds the State entered into a valid contract with all persons taking the coupons to

receive them in payment of taxes and state dues, and that the act of 1872, so far as it conflicted with this contract, was void.

In *Clarke* v. *Tyler*, 30 Grattan, 134, decided in 1878, it was said that this decision in *Antoni* v. *Wright* " must be held to be the settled law of this State."

By an act passed March 25, 1873, it was declared that every officer charged with the collection of taxes should deduct from the matured coupons which might be tendered to him in payment of taxes or other dues to the State, the tax upon the bonds from which the coupons were cut, which tax was declared to be fifty cents on the hundred dollars market value of said bonds.  This law was repeated in the act of 1876, and bore oppressively upon the holders of the coupons, inasmuch as it compelled them to pay the tax due on bonds of which they were not the owners, and of the owners of which they had no knowledge.  It was a clear impairment of the obligation of the contract with the holders of the coupons.  The validity of this act came before this court for consideration in the case of *Hartman* v. *Greenhow*, 102 U. S. 672, 685, and it was held to be unconstitutional.  Mr. Justice Field, speaking for the court in that case, said : " We are clear that this act of Virginia of 1876, requiring the tax on her bonds issued under the funding act of March 30, 1871, to be deducted from the coupons originally attached to them, when tendered in payment of taxes or other dues to the State, cannot be applied to coupons separated from the bonds and held by different owners, without impairing the contract with such bondholders contained in the funding act, and the contract with the bearer of the coupons."

By an act of the legislature of Virginia, approved on the 28th of March, 1879, another plan for the settlement of the public debt was promulgated.  By the first section it was enacted, " That to provide for funding the debt of the State, the governor is hereby authorized to create bonds of the State, registered and coupon, dated the 1st day of January, 1879, the principal payable forty years thereafter, bearing interest at the rate of three *per cent per annum* for ten years, and at the

rate of. four *per centum per annum* for twenty years, and at the rate of five *per centum per annum* for ten years, payable in the cities of Richmond, New York or London, as hereinafter provided, on the 1st days of July and January of each year, until the principal is redeemed." "The coupons on said bonds shall be receivable at and after maturity for all taxes, debts, dues and demands due the State, and this shall be expressed on their face. The holder of any registered bond shall be entitled to receive from the treasurer of the State a certificate for any interest thereon, due and unpaid, and such certificate shall be receivable, etc. All obligations created under this act shall be forever exempt from all taxation, direct or indirect, by the State or by any county or corporation therein, and this shall be expressed on the face of the bonds." "The bonds hereby authorized shall be issued only in exchange for the outstanding debt of the State, as hereinafter provided." Bonds were issued under this act in conformity with its requirements, and some of the coupons thereon are the subject of controversy in one or more of the suits now before us for consideration. The questions relating to their receivability for taxes and other public dues, and to the validity of subsequent laws passed in derogation or obstruction thereof, are the same as those which arise under like circumstances upon the coupons of the bonds issued under the act of 1871.

At the session of the General Assembly held in 1882 still another scheme for funding and reducing the state debt was formulated by an act approved February 14 of that year, which specified the amount of each class of indebtedness supposed to be obligatory upon the State of Virginia in relation to the corresponding obligation of the State of West Virginia, and the rate of percentage at which new bonds were proposed to be issued to the public creditors according to the different classes of the debts. These new bonds were to be dated July 1, 1882, and payable July 1, 1932, with interest at three per cent per annum. The commissioners of the sinking fund were authorized to issue them either as registered or coupon bonds, but no security was proposed for the payment of the bonds or coupons except the pledged faith of the State. This

act was called "the Riddleberger act," and was declared to be the final proposition which the State would make to its creditors. Of course it was not to be expected that those who held bonds issued under the acts of 1871 or 1879, with coupons invested with the quality of legal tender for the payment of taxes and other public dues, would willingly surrender their bonds in exchange for the bonds to be issued under the Riddleberger act; and for the purpose apparently of creating motives to induce such bondholders to make the exchange, several ancillary bills were passed at the same session, calculated to discourage and hamper the use of the tax-paying coupons of 1871 and 1879. One of these bills, approved the 14th of January, 1882, (recited in full in 107 U. S. 771–774,) required that whenever any taxpayer should tender to any person whose duty it was to collect or receive taxes, debts or demands due the Commonwealth, any papers purporting to be coupons detached from bonds of the Commonwealth issued under the act of 1871, in payment of any such taxes, debts and demands, the person to whom such papers were tendered should receive the same, giving the party tendering a receipt stating that he had received the same for the purpose of identification and verification, but that he should at the same time require such taxpayer to pay his taxes in coin, legal-tender notes or national bank bills, and give him a receipt therefor. In case of his refusal to pay, the taxes should be collected as all other delinquent taxes were collected. The act then provided for a proceeding in the county court or hustings court of the city to ascertain whether the coupons tendered were genuine legal coupons receivable for dues or not. This proceeding was to be instituted by the petition of the taxpayer, and defended by the Commonwealth's attorney, and the matter was to be tried by jury. If the decision should be in favor of the taxpayer, the judgment was to be certified to the treasurer, who thereupon was required to receive the coupons for taxes and refund the money paid by the taxpayer out of the first money in the treasury. The law further provided that, if any taxpayer should apply for a mandamus to compel the collector to receive his coupons for taxes, a similar proceeding should take

place, for the purpose of ascertaining the identity and validity of the coupons, and when found to be genuine a mandamus might issue. The suggestion upon which this law was based, as recited in the preamble thereof, was, that many spurious, stolen and forged bonds were in circulation, which made it imprudent to receive coupons in payment of taxes without an investigation first had with regard to their genuineness and validity. It is apparent that such a cumbrous mode of proceeding was a very awkward substitute, so far as the taxpayer was concerned, for the reception of his coupons as so much money when presented.

Another act, approved on the 26th of January, 1882, provided that in case of proceedings instituted against a taxpayer for the collection of his tax, notwithstanding his tender of coupons in payment thereof, he should be authorized to pay the tax under protest, in lawful money, and might within thirty days thereafter sue the officer for the amount, and if it should be determined that it was wrongfully collected, the amount should be returned, and it was declared that no writ of injunction, supersedeas, mandamus, prohibition or other writ whatever should be issued to hinder or delay the collection of tax.

Another act, approved on the 7th of April, in the same year, changed the general law of mandamus to coincide with the provisions of the act of January 26th.

The validity of these acts came before this court for consideration in the case of *Antoni* v. *Greenhow*, and the question in that case was whether they so far affected the remedy of the holder of coupons as to impair the obligation of the contract made by the State to receive them for taxes and other dues. This was the general question presented, although it is true that the particular question in that case was, whether the proceeding by mandamus to compel the acceptance of the coupons in payment of taxes and other dues was unconstitutionally obstructed. The case was instituted by Antoni, a taxpayer, by a petition to the Supreme Court of Appeals of Virginia for a mandamus against Greenhow, the treasurer of the city of Richmond, to compel him to accept a coupon ten-

dered by the petitioner in part payment of his taxes. The treasurer answered that he was ready to receive the coupon as soon as it had been legally ascertained to be genuine and by law receivable, referring, of course, to the law as it then stood, prescribing the special proceedings before mentioned for ascertaining the genuineness and validity of coupons. To this answer a demurrer was filed. Upon the hearing the court was equally divided on the questions involved, and denied the writ. The judgment was brought by writ of error to this court, and the precise question was, whether the acts of 1882 unconstitutionally impeded the remedy by mandamus. The court, in discussing the question, discussed the general effect of the said statutes, and came to the conclusion that they did not interpose any material obstructions to the proceeding, so as to be obnoxious to the charge of impairing the obligation of the contract.

Under all the obstacles with which the holders of coupons now had to contend in utilizing those instruments in the payment of taxes and public dues, (the only way in which any satisfaction thereof could be obtained,) they still succeeded in disposing of many of them, and more stringent legislation was finally resorted to for the evident purpose of suppressing their use altogether. In the session of 1884 several acts of the General Assembly were passed to this end. By an act approved March 12, 1884, it was made the duty of the attorneys for the Commonwealth to defend the suits brought by taxpayers, and, if decided against the Commonwealth, to carry the case to the higher courts by appeal; to defend all suits brought in the federal courts; and to carry judgments against the Commonwealth or the collector of taxes by appeal to the Supreme Court of the United States. An act approved March 13, 1884, declared that no action of trespass or on the case should be brought or maintained against any collecting officer, for levying upon the property of any taxpayer who had tendered in payment, in whole or in part, any coupons cut from bonds of the State for such taxes, and who should refuse to pay his taxes in gold, silver, United States treasury notes or national bank notes. Another act, approved on the 15th of

March, 1884, required all licenses to be paid in lawful money of the United States. Still another act, approved March 19, 1884, required that all coupons received for taxes, beyond what they would have been exchanged for under the Riddleberger act, should be charged to the bond from which they were clipped, as a payment on the principal of the bond. Finally, by the tax act, approved March 15, 1884, section 65, it was declared that no person should sell tax-receivable coupons from bonds of the State of Virginia without a special license, for which privilege he should pay one thousand dollars for each office or place of business kept for that purpose, and in addition thereto a tax of twenty *per centum* upon the face value of all tax-receivable coupons sold by him, and should give to the purchaser a certificate stating that he had sold such coupons to the purchaser, naming him and specifying the number and amount of the coupons and date of sale; and whenever such coupons should be tendered for taxes the broker's certificate should be delivered to the collector. This section was subsequently amended by an act passed May 23, 1887, so as to include in the prohibition not only the selling or offering to sell tax-receivable coupons, but the tendering, passing or offering to tender or pass for another any such coupons, without a special license therefor, and the license fee was made $1000 for the privilege of selling or offering to sell coupons in each county, city or town of over 10,000 inhabitants, and $500 for each county, city or town of under 10,000 inhabitants; and the privilege was confined to selling, tendering and passing such coupons to taxpayers residing, or owning property subject to tax, within the county, city or town in which the license was obtained, and it was declared that any person violating this provision should be deemed guilty of a misdemeanor, and upon conviction should be fined, at the discretion of a jury, not less than $500 nor more than $2000. Section 91 declared that every attorney-at-law should pay an annual license fee of fifteen dollars if under five years' practice, and twenty-five dollars if over five years' practice; but that no attorney thus licensed should be allowed to bring suit against the Commonwealth, or any treasurer or collector of

taxes, for the recovery of money for coupons tendered for taxes, unless he took out a special license therefor, for which privilege he should pay a specific license tax, in addition to the tax before required, of two hundred and fifty dollars.

In April, 1885, after the passage of these various acts, the *Virginia Coupon Cases* (so called) reported in 114 U. S. 269, etc., came before this court for consideration. There were eight of these cases. One of them, *Poindexter* v. *Greenhow*, the leading case in the report, was an action of detinue brought by Poindexter, a taxpayer, against Greenhow, treasurer of Richmond, for a desk of the plaintiff, of the value of thirty dollars, seized and taken by Greenhow on the 25th of April, 1883, for the purpose of raising the taxes due from the plaintiff after he had tendered coupons in payment thereof. Upon an agreed statement of facts, no dispute being raised as to the genuineness of the coupons, judgment was given in the hustings court of Richmond for the defendant, on the ground that the plaintiff should have paid his tax in lawful money and pursued the remedy pointed out in the acts of 1882. As this was the highest court in the State in which a decision in the case could be had, the judgment was brought by writ of error to the Supreme Court of the United States, and the question was now directly raised, whether the restraining acts passed by the legislature of Virginia were of such force and validity as to prevent the taxpayer from suing the collecting officer for taking his goods in satisfaction of taxes after a tender of coupons for the payment thereof, without adopting the proceedings required by the said acts. This court held that the acts were unconstitutional so far as they prohibited the collector or receiver of the taxes from accepting coupons issued under the act of 1871 in payment of taxes, according to the contract contained in said act, and imposed upon the taxpayer the circuitous and onerous proceeding of establishing the genuineness of his coupons in court; that the tender of the coupons was equivalent to the tender of legal money in payment of the tax, and exonerated the taxpayer from further molestation in respect thereof; and that, if he continued to hold himself in readiness to pay said tax in the coupons tendered, his

property could not lawfully be taken in satisfaction of the same.

The court distinguished this remedy of the taxpayer from that which was in question in the case of *Antoni* v. *Greenhow*, in that in the latter case the proceeding by mandamus alone was under consideration, and that form of proceeding for relief was held not to be materially obstructed by the acts of 1882; and it was held that nothing in the decision of that case concluded the rights of taxpayers and coupon holders in reference to other remedies which the law gave them for the unlaw- ful seizure of their property in satisfaction of the tax, after having duly tendered coupons in payment thereof. Therefore, without expressly overruling the case of *Antoni* v. *Greenhow*, the court decided that the acts referred to were unconstitu- tional, so far as they had the effect of depriving the taxpayer of his remedy by detinue, or trespass, or case, or other proper action, for unlawful seizure of his goods after tendering tax- receivable coupons in payment of his taxes. The judgment of the hustings court was, therefore, reversed. The question was very fully and elaborately discussed by Mr. Justice Mat- thews in delivering the opinion of the court, although there was a dissenting opinion on the part of the Chief Justice and three of the Associate Justices.

Two other of the coupon cases, *White* v. *Greenhow* and *Chaffin* v. *Taylor*, were cases of trespass for taking the property of the taxpayers in payment of taxes after they had tendered coupons in payment thereof, and were in all substantial respects similar to the case of *Poindexter* v. *Greenhow*, and were decided in the same way. In one of them, *Chaffin* v. *Taylor*, the act of March 13, 1884, which expressly forbids an action of. tres- pass or case against a collecting officer, was referred to and relied on by the defendant in the action.

A fourth case, that of *Baltimore & Ohio Railroad Co.* v. *Al- len*, auditor of accounts of the State of Virginia, was a bill for injunction, filed in the Circuit Court of the United States, to pre- vent the defendant from seizing the cars and other personal property of the complainant in satisfaction of taxes alleged. to be due, for the payment of which the railroad company had

tendered tax-paying coupons. An injunction was granted by the Circuit Court to prevent the seizure of the complainant's property, and the decree was affirmed by this court upon the same grounds which were taken in the case of *Poindexter* v. *Greenhow*.

The fifth case, *Carter* v. *Greenhow*, was an action brought in the Circuit Court of the United States, and founded upon section 1979 of the Revised Statutes of the United States, by which every person who, under color of any statute, etc., of any State or Territory, subjects a citizen of the United States, or other person within the jurisdiction thereof, to the deprivation of any rights, privileges or immunities secured by the Constitution and laws of the United States, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. The plaintiff in said action set forth that in May, 1883, he tendered certain tax-paying coupons of the State, in payment of taxes due from him, to the defendant Greenhow, treasurer of the city of Richmond, who refused to receive the same in payment, and unlawfully entered upon plaintiff's premises and seized and took certain property of the plaintiff to sell the same in payment of said taxes; that the plaintiff had a right under the Constitution of the United States to pay his said taxes in the coupons referred to, and the defendant refused to receive the same under the color of, and by the command of, the act of assembly of the State of Virginia, approved January 26, 1882, which forbids collectors of taxes due the State to receive in payment thereof, anything except gold, silver, etc.; and that he levied on said property under the command of the 18th section of another act of assembly, approved April 1, 1879, and of other statutes enacted by the General Assembly of the State of Virginia, which statutes he alleged to be repugnant to the Constitution of the United States and void. The amount of damages claimed in the action was less than five hundred dollars, and therefore it was not within the jurisdiction of the Circuit Court of the United States, unless it should be sustained by the section of the Revised Statutes referred to. Judgment was given for the defendant, and was affirmed by this court on the ground

that the case did not come within section 1979, because the right claimed was not one of the rights referred to in that section.

The sixth case, *Pleasants* v. *Greenhow*, was a bill for injunction, filed in the Circuit Court of the United States, to restrain the defendant Greenhow from levying on plaintiff's property for taxes after coupons were tendered therefor. The amount of taxes being less than five hundred dollars, relief was prayed for on the same ground of deprivation of rights, which was preferred as the cause of action in the case of *Carter* v. *Greenhow*. The bill was dismissed by the Circuit Court, and its decree was affirmed by this court for the same reason which prevailed in that case.

The seventh case was *Marye, Auditor of the State of Virginia* v. *Parsons*. Parsons, a citizen of New York, filed a bill in equity in the Circuit Court of the United States against Marye, Auditor of the Commonwealth of Virginia; Greenhow, Treasurer of the city of Richmond; Hill, Treasurer of the city of Norfolk; Dunnington, Treasurer of the city of Lynchburg; Munford, Commissioner of Revenue of Richmond; Price, Commissioner of Lynchburg; and Langley, Commissioner of Norfolk. He alleged that he was the owner of a large amount of coupons cut from bonds of Virginia, issued under the act of 1871, and receivable by that act in payment for taxes, debts and demands due the State, a list of which coupons was appended to the bill. He claimed that they constituted a contract with the State, and, after setting forth the laws which had been passed by the State of Virginia for preventing or interfering with the use of such coupons in the payment of taxes and other state dues, (which laws he alleged to be unconstitutional and void,) he prayed that the defendants, as officers of the State, might be compelled specifically to perform the contract of the State with regard to said coupons, and to receive them in payment of taxes and other dues, and that a mandatory injunction for that purpose might be issued. The defendant filed a demurrer, plea and answer to the bill, and a perpetual injunction, as prayed for, was awarded by the Circuit Court. The complainant did not allege that he owed

any taxes or other demands to the State of Virginia for which he had offered coupons in payment, but his ground of action was that the coupons held by him were valueless, so long as the officers of the State, in obedience to its laws, refused to receive such coupons in payment of taxes, and hence he sought the relief prayed for in his bill. This court reversed the decree of the Circuit Court, holding that the injury complained of was of an abstract nature, *damnum absque injuria*, and that the bill should have been dismissed on that ground; and that none but taxpayers, or those who are indebted to the State upon some other claim or demand, are in a position to complain of the refusal of the officers of the State to receive coupons in payment of such taxes and demands.

The remaining case was that of *Moore* v. *Greenhow*, being a petition for a mandamus to compel the defendant to receive coupons in payment of a license tax as a sample merchant, the petitioner not having pursued the course pointed out by the act of January 14, 1882, for establishing the genuineness of the coupons tendered by him. The petition was denied by the Circuit Court of Richmond, and its decision was affirmed in conformity with the conclusion arrived at in the case of *Antoni* v. *Greenhow*, that the act of January 14, 1882, as applicable to the remedy of mandamus, did not violate the Constitution of the United States.

Several other coupon cases came before this court in October term, 1885, and were decided in February, 1886. They were *Barry* v. *Edmunds*, 116 U. S. 550; *Chaffin* v. *Taylor*, 116 U. S. 567; *Royall* v. *Virginia*, 116 U. S. 572; and *Sands* v. *Edmunds*, 116 U. S. 585. These cases do little more than repeat the views of the court contained in the coupon cases decided in the previous year, except perhaps in deciding in the case of *Royall* v. *Virginia*, that the license tax of a practising lawyer was a tax within the meaning of the act of 1871, and payable in coupons attached to bonds issued under that act.

In another case, *Royall* v. *Virginia*, 121 U. S. 102, it appeared that an information was filed against Royall for practising as a lawyer without first having obtained a revenue license. He pleaded payment of the license fee, partly in a

coupon cut from a bond issued under the act of 1871 and partly in cash. The Commonwealth demurred to this plea, and it was held that the demurrer admitted that the coupon was genuine, and bore on its face the contract of the State to receive it in payment of taxes, etc., and that this showed a good tender, and brought the case within the ruling in *Royall* v. *Virginia*, 116 U. S. 572.

In the session of the General Assembly of Virginia of 1886, several additional acts were passed, all having for object the imposition of further obstructions and impediments in the way of using the tax-paying coupons. An enumeration of these acts, with a general indication of their purport, is all that is necessary to state. By the act of January 21, 1886, it was declared that expert evidence shall not be received of the genuineness of any paper or instrument made by machinery, or in any other manner than by the actual or personal handwriting of the party to be charged, or his agent. By the act of January 26, 1886, it was declared that in the trial of any issue involving the genuineness of a coupon purporting to have been cut from any bond authorized by law to be issued by the State, or by any city, county or corporation, the defendant may demand the production of the bond, and thereupon it shall be the duty of the plaintiff to produce such bond, with proof that the coupon was actually cut therefrom. On the same day another act was passed declaring that any person who shall solicit or induce any suit or action to be brought against the State of Virginia, or any citizen thereof, by verbal representations, or by writing or printing, shall be deemed guilty of the offence of champerty, and subject to fine and imprisonment. By the act of March 1, 1886, it was declared that any person licensed to practise law in Virginia who shall solicit or induce any suit or action to be brought against the State, or any citizen thereof, by verbal representations, or by writing or printing, shall be deemed guilty of barratry, and if found guilty it is made the duty of the court to revoke his license and disbar him forever from practising law in the Commonwealth. By an act of March 4, 1886, it was declared that all license fees required for the transaction of any business

in the State shall be paid in coin, legal-tender notes or national bank bills; and if coupons shall be tendered in payment thereof, they shall be received by the officer for identification by the proceedings prescribed in the act of 1882; but no license shall issue to the applicant, nor shall he have the right to conduct business or pursue his profession until said coupons have been verified in the manner prescribed by said act; and by another act, passed February 27, 1886, it was declared that after the 1st day of July, 1888, no petition shall be filed or other proceeding instituted to try the question whether any paper purporting to be a coupon detached from any bond of the State is genuine and legally receivable for taxes and other state dues, except within one year from said 1st day of July, 1888, if such coupon first became receivable prior to that time; and within one year from the time the coupon becomes receivable if it becomes receivable after that date. This law became incorporated in the code of 1887 as section 415. Finally as, according to the decisions of this court in 1885 and 1886, the collecting officers were liable to action for proceeding against the property of the taxpayers who had tendered coupons in payment of their taxes, on the 12th of May, 1887, an act was passed authorizing suits to be brought against such taxpayers for taxes due from them, which suits were to be in the name of the Commonwealth, and to be commenced by a notice served on the party liable for the tax, or on the agent of such party who may have tendered the coupons. If the defendant relies upon the tender of coupons as payment he shall plead the same specifically in writing, and file the coupons tendered with the clerk, and the burden of proving the tender and genuineness of the coupons shall be on the defendant. If established, the judgment shall be for the defendant on the plea of tender. If the defendant fail in his defence, there shall be judgment for the Commonwealth for the taxes due and interest and costs, and execution shall issue thereon as in other cases; and if judgment be against the defendant, a fee of ten dollars is allowed to the attorney for the Commonwealth as part of the costs in the case; but the Commonwealth is not to be liable for any fees or costs. The act is set forth in full in the case *In re Ayers*, 123 U. S. 451.

Since the passage of this act the cases *In re Ayers, In re Scott* and *In re McCabe*, 123 U. S. 443, have come before this court for consideration. They were decided in December, 1887. These cases came before us on applications for *habeas corpus*, directed to the marshal of the United States for the Eastern District of Virginia, who held the applicants, one of them the attorney general of Virginia, another the auditor of the State, and the third the Commonwealth's attorney for Loudoun County, who had been committed for contempt by the Circuit Court of the United States for disobedience to a restraining order. The case in which said order was made was this: James P. Cooper and others, subjects of Great Britain, filed their bill of complaint in the Circuit Court of the United States for the district aforesaid against Marye, auditor of the State of Virginia, Ayers, attorney general thereof, and the treasurers of counties, cities and towns in the State, and the Commonwealth's attorneys of counties, cities and towns therein; in which bill it was alleged, amongst other things, that the complainants, on the faith of the decisions of this court, that the State of Virginia could not impair the value of the coupons issued under the acts of 1871 and 1879 as a tender for taxes, had bought a large quantity of said coupons in open market in London and elsewhere, amounting to more than one hundred thousand dollars, for the purpose of selling said coupons to the taxpayers of Virginia, believing that they would be able to sell them at considerable advance. The bill then set forth the act of assembly of May 12, 1887, authorizing and requiring suits to be brought in the name of the Commonwealth against taxpayers who should have tendered coupons in payment of their taxes. It further alleged that this act is repugnant to the Constitution of the United States, for the reason that, taken in connection with the act of January 26, 1882, it first commands the State's officers to refuse to receive those coupons, and then commands them to bring suits against those who have tendered them, as well as against those who have tendered spurious coupons; that it imposes upon the defendants heavy costs and fees, etc. It further set out the provisions of various other acts before referred to, tending to

embarrass the holders of coupons in the use of the same, and in the proceedings for establishing their genuineness. The bill prayed that the defendants might be restrained and enjoined from bringing or commencing any suit provided for by the said act of May 12, 1887, or from doing any other act to put said statute into force and effect, and that until the hearing of a motion for said injunction a restraining order might be made to that effect. A restraining order was accordingly made by the court in pursuance of the prayer of the bill, and it was for disobedience to this order that the parties in the cases of Ayers, Scott and McCabe were committed for contempt. This court, after a very full and careful examination of the questions arising in the cases, decided that the suit of Cooper and others against Marye, Ayers and others, in which the said restraining order and order of commitment for contempt were made, was virtually and in effect a suit against the State of Virginia, and, therefore, in violation of the Eleventh Amendment of the Constitution of the United States, which declares that the judicial power of the United States, shall not be construed to extend to any suit in law or equity commenced or prosecuted against one of the United States by citizens of another State, or by citizens or subjects of any foreign State; and the judgment of the court was that the Circuit Court had no jurisdiction to entertain said suit, and that its acts and proceedings were void; and the petitioners, Ayers, Scott and McCabe were discharged. The cases in which the question has been considered in this court as to when a proceeding against the officers of a State may be considered as a proceeding against the State itself, or only as a proceeding against the officers for a violation of a clear duty imposed upon them by law, were carefully reviewed and distinguished in the elaborate opinion of the court delivered by Mr. Justice Matthews, and may be referred to as throwing much additional light upon that vexed and interesting question; but it is particularly referred to here, in connection with the other cases cited, for the purpose of showing the conditions, circumstances and aspects in which the questions arising on these tax-paying coupons have presented themselves to the court.

· Without committing ourselves to all that has been said, or even all that may have been adjudged, in the preceding cases that have come before the court on the subject, we think it clear that the following propositions have been established:

First, that the provisions of the act of 1871 constitute a contract between the State of Virginia and the lawful holders of the bonds and coupons issued under and in pursuance of said statute;

Second, that the various acts of the assembly of Virginia passed for the purpose of· restraining the use of said coupons for the payment of taxes and other dues to the State, and imposing impediments and obstructions to that use, and to the proceedings instituted for establishing their genuineness, do in many respects materially impair the obligation of that contract, and cannot be held to be valid or binding in so far as they have that effect;

Third, that no proceedings can be instituted by any holder of said bonds or coupons against the Commonwealth of Virginia, either directly by suit against the Commonwealth by name, or indirectly against her executive officers to control them in the exercise of their official functions as agents of the State;

Fourth, that any lawful holder of the tax-receivable coupons of the State issued under the act of 1871 or the subsequent act of 1879, who tenders such coupons in payment of taxes, debts, dues and demands due from him to the State, and continues to hold himself ready to tender the same in payment thereof, is entitled to be free from molestation in person or goods on account of such taxes, debts, dues or demands, and may vindicate such right. in all lawful modes of redress—by suit to recover his property, by suit against the officer to recover damages for taking it, by injunction to prevent such taking where it would be attended with irremediable injury, or by a defence to a suit brought against him for his taxes or the other claims standing against him. No conclusion short of this can be legitimately drawn from the series of decisions which we have above reviewed, without wholly overruling that rendered in the *Coupon. Cases* and disregarding many of the rulings

in other cases, which we should be very reluctant to do. To the extent here announced we feel bound to yield to the authority of the prior decisions of this court, whatever may have been the former views of any member of the court.

There may be exceptional cases of taxes, debts, dues and demands due to the State which cannot be brought within the operation of the rights secured to the holders of the bonds and coupons issued under the acts of 1871 and 1879. When such cases occur they will have to be disposed of according to their own circumstances and conditions.

It was earnestly contended in the dissenting opinion in the *Coupon Cases*, that the defence of a tender of coupons set up by a taxpayer when prosecuted for the payment of his taxes, was in the nature of a set-off and could not be enforced against a State any more than a suit could be prosecuted against it; in other words, that a set-off is in reality a cross-suit and as such subject to the prohibition of the Eleventh Amendment. But the majority of the court held, and perhaps with better reason, that where a set-off or counter-claim is made by virtue of an agreement or contract between the parties, it no longer has the character of a mere set-off, but becomes attached to the primary claim as *pro tanto* a defeasance thereof. At all events, such was the decision of the court, and it is not our purpose to question the authority of that decision so far as it may apply to the cases now before us.

It remains to apply the law as we conceive it to be to the several cases now under consideration.