### CONWELL v. CENTRAL MISSOURI TELEPHONE CO.

No. 4536.

District Court, W. D. Missouri, W. D. March 10, 1948.

400.

See, also, 74 F.Supp. 542.

Robert L. Jackson, of Kansas City, Mo., for plaintiffs.

John A. Morrison, of Kansas City, Mo., and John F. Baker, of Chicago, Ill. (Dooley & Baker, of Chicago, Ill., and Morrison, Nugent, Berger, Hecker & Buck, of Kansas City, Mo., of counsel), for defendant.

**DUNCAN, District Judge.**

Plaintiffs instituted this action under the Fair Labor Standards Act of 1938, 29 U.S. C.A. § 201 et seq., to recover for overtime compensation alleged to have been earned while employed by defendant as night telephone operators in excess of 40 hours per week. It is admitted that plaintiffs were engaged in commerce as defined by the Act.

There is little dispute about the facts. Mrs. Conwell was employed as night telephone operator at Holden, Missouri, for approximately 20 years, and Miss Pinkepank was employed in the same capacity at Sweet Springs, Missouri, for a little longer period of time. During all of that period of time plaintiffs were on what is termed an eleven-hour tour. They were required to go on duty at nine o'clock in the evening and to remain there until eight o'clock the following morning. They were paid for eight hours only until 1943. The difference between the time compensated for and eleven hours was designated as sleeping time, and a cot was furnished by defendant and placed in a room near the switchboard so that the operator might utilize such time as her duties permitted in rest or sleep. In 1943 an increase in pay was requested and additional compensation was allowed by reducing the sleeping time at Holden from three to two hours and at Sweet Springs from three to two and one-half hours. Thereafter, Mrs. Conwell was paid for nine hours and Miss Pinkepank for eight and one-half. The switchboards were located in buildings owned or leased and controlled by defendant and were not in the homes of the operators. There was no change in plaintiffs' duties after the passage of the Fair Labor Standards Act of 1938. There was no written contract of employment. At the beginning of the period for which overtime compensation is sought, plaintiff Pinkepank was receiving 32 cents per hour and plaintiff Conwell 33 cents per hour. Periodic increases ultimately raised the hourly wage to 40 cents. In 1943 when plaintiffs requested an additional wage increase, defendant simply shortened the sleeping time and increased the working time.

Defendant has about 25 exchanges in central Missouri. Sweet Springs has a population of about 1,800 and between 600 and 700 telephone patrons. Holden is slightly smaller in population and number of patrons. Plaintiffs are still employed by defendant.

The switchboards operated by plaintiffs are commonly known as drop boards. Whenever a call comes into the board a small metallic disk-like device attached to the switchboard drops and exposes an aperture into which a plug is inserted to form the connection. Many of the patrons of each of the offices are rural subscribers, and a number of such subscribers are on each line. It is not necessary for a patron on a rural line calling another patron on the same line to route the call through the exchange. Each patron on such a line has a designated "ring" and answers when he recognizes his designated "ring" or signal. But notwithstanding the fact that such calls are not routed through the exchange, when a call is placed by one subscriber to another subscriber on the same line, the drop to which the line is attached on the board falls, and it requires the manual effort of the operator to replace it. Also during electrical storms the drops on a board will often fall, and the operator must replace them before the lines are again available for use in making connections. Consequently during the entire period that plaintiffs worked for defendant, they were required to replace the drops after they fell at whatever time that might be during their hours of duty.

Several long distance lines were routed through each of the switchboards each night. These lines afforded long distance service to patrons of smaller communities where the switchboards were closed at early hours each night. These long distance lines were in addition to the regular lines serving Sweet Springs and Holden.

The operators were charged with the responsibility of making records of long distance calls. Occasionally they dusted the boards, and during the winter months they maintained the fire in the stove in their exchange. However, their duties outside those of attending the switchboards, it seems to me, are of no consequence in

determining whether they come within the provisions of the Fair Labor Standards Act.

The number of calls through each of the exchanges varied with the talking desires of the patrons. The load usually had decreased considerably by eleven o'clock or midnight. Thereafter calls were infrequent. Often there were considerable periods of time when there were no calls, and other periods when calls were more numerous, requiring more constant attention to the board. Usually after the ordinary load began to decrease, an automatic, electric bell was turned on, and the operator was permitted to leave the board. If a call came through the board, the bell sounded, attracting the attention of the operator.

The operator was not permitted to leave the premises or the room in which the switchboard was located between the time she went on duty at nine o'clock in the evening and the time her tour of duty ended at eight o'clock the following morning. Whatever the requirements of the board were with respect to the number of calls to be serviced by her, she was required to be there. Although the evidence is silent as to the exact number of calls that went through after midnight, it does reveal that the number of such calls varied nightly. Some nights the operators were able to get several hours of uninterrupted sleep; at other times they were disturbed at frequent intervals and obtained very little sleep. Whatever time was used in actual attendance upon the switchboard in excess of eight hours per day prior to 1943, and in excess of eight and one-half hours for Pinkepank and nine hours for Conwell thereafter, was not compensated for by the defendant.

An audit was made of defendant's records by an auditor employed by plaintiffs. Defendant does not deny the correctness of the figures but does deny its liability. The audit shows that the amount of overtime compensation allegedly due plaintiff Conwell is $1,331.98. The amount allegedly due plaintiff Pinkepank is $1,121.97. These figures represent the difference between the compensation they received and compensation for the full eleven hours during

which they were required to be present and ready to serve defendant's patrons. More briefly, these figures represent compensation for the sleeping time for which they were not paid.

■ Defendant insists that the action comes within the provisions of the Portal-to-Portal Act, 29 U.S.C.A. § 251 et. seq., and that as plaintiffs did not allege that they were entitled to overtime as the result of the express provisions of a written contract or a custom or practice with respect to the particular industry, they are not entitled to recover. There is no such allegation in the complaint. The question was presented to the court in a motion to dismiss. That motion was overruled in a memorandum opinion.[1] The question is again raised here, and for the reasons set out in the memorandum opinion is ruled against defendant.

Defendant contends that the Fair Labor Standards Act does not apply to plaintiffs because they were engaged in employment in small telephone exchanges covered by paragraph 6 of Administrative Bulletin 13 of the Wage and Hour Division[2]; that the applicable Missouri statute of limitations[3] is a bar to plaintiffs' claims for all compensation prior to two years before bringing this suit on January 21, 1947; and that plaintiffs have failed to sustain the burden of proof as to the number of hours for which they are entitled to compensation if they are covered by the Act.

At the close of all the testimony the defendant filed a motion to dismiss for the above reasons and also directed against Pinkepank on the additional ground that she had failed to file her written consent to become a party plaintiff as required by the Portal-to-Portal Act.

The question of whether Pinkepank was required to file her written consent to become a party plaintiff, and the question of the Missouri statute of limitations will be disposed of first.

■ Section 257 of the Portal-to-Portal Act, 29 U.S.C.A. § 251 et seq., provides: "The statute of limitations prescribed in section 255(b) of this title shall also be applicable (in the case of a collective or representative action commenced prior to May 14, 1947 under the Fair Labor Standards Act of 1938, as amended) to an individual claimant who has not been specifically named as a party plaintiff to the action prior to the expiration of one hundred and twenty days after May 14, 1947. In the application of such statute of limitations such action shall be considered to have been commenced as to him when, and only when, his written consent to become a party plaintiff to the action is filed in the court in which the action was brought." Plaintiff Pinkepank did not file any written consent.

Much confusion arose under the Fair Labor Standards Act concerning actions for and on behalf of "other employees similarly situated." Many actions were

---

[1] Conwell v. Central Missouri Telephone Co., D.C., 74 F.Supp. 542.

[2] "6. In a few occupations periods of inactivity need not be considered as hours worked even though the employee is subject to call. The answer will generally depend upon the degree to which the employee is free to engage in personal activities during periods of idleness when he is subject to call and the number of consecutive hours that the employee is subject to call without being required to perform active work—i. e., the frequency with which the employee is called upon to engage in work. In these cases, the nature of the employee's work involves long periods of inactivity which the employee may use for uninterrupted sleep, to conduct personal business affairs, to carry on a normal routine of living, etc. A good example of this is the employee

of a small telephone exchange operating a switchboard located in the employee's house. During the night no one is in direct attendance at the switchboard and an alarm bell awakens the operator if a subscriber wishes to make a telephone call. The operator has her bed alongside the switchboard and is able to get several hours of uninterrupted sleep every night, as experience over a considerable period of time may often demonstrate. Thus, if over a period of several months a telephone operator has been called upon to answer only a few calls between the hours of twelve and five in the morning a segregation of such hours from hours worked will probably be justified."

[3] Mo.R.S.1939, § 1016 as amended, Mo. R.S.A.

brought by one employee, and in some instances by more than one employee, for himself and on behalf of others similarly situated, and considerable confusion arose over the judicial construction of that provision of the act. Some courts held that it was not necessary to name those similarly situated; others held that it was.

Evidently the Congress recognized this confusion by writing into the Portal-to-Portal Act the provision requiring the filing of a written consent in future actions and in pending actions where a person had not been specifically named a party plaintiff within 120 days after the enactment of the Portal-to-Portal Act.

Even before the passage of the Portal-to-Portal Act it was my practice in all wage and hour cases where "other employees similarly situated" were not named in the complaint to require written consent of such persons on whose behalf the action was brought. It seemed to me that a judgment would not be res judicata as to such persons who were not so named or had not given their consent to the bringing of such an action. We do not have that situation here. The provision of the Portal-to-Portal Act requiring the filing of a written consent is applicable to pending actions only where a person is not specifically named a party plaintiff within 120 days after the enactment of the Portal-to-Portal Act. Miss Pinkepank was named in the original complaint. While the caption recites that the action is brought by "Lillie Conwell, individually and as representative of Laura Pinkepank," Miss Pinkepank was in fact a plaintiff in this action. It is my view that she was "specifically named as a party plaintiff" at the time the complaint was filed. Therefore, no written consent was necessary. She has actively participated in the action since its commencement. Even if she had not been specifically named a party plaintiff, it is my view that her active participation takes the place of the written consent required by the Portal-to-Portal Act. The motion to dismiss as to Miss Pinkepank on that ground is overruled.

■ The next question, before proceeding to a determination of the case on its merits, is that of the statute of limitations.

Prior to the Portal-to-Portal Act there was no Federal statute of limitations governing actions arising under the Fair Labor Standards Act. Furthermore, since this action was begun before the passage of the Portal-to-Portal Act and since Miss Pinkepank was named a party plaintiff at the time the suit was filed, the statute of limitation provided in the Portal-to-Portal Act is not applicable to this action. Hence, we must look to the State statute of limitations to determine the period within which this action had to be brought.

■ The Missouri statute of limitations, Mo.R.S.1939, § 1016, Mo.R.S.A., provided: "Within two years: An action for libel, slander, assault, battery, false imprisonment or criminal conversation. All actions against physicians, surgeons, dentists, roentgenologists, nurses, hospitals and sanitariums for damages for malpractice, error, or mistake shall be brought within two years from the date of the act of neglect complained of."

This statute first appeared in its original form in the territorial laws of Missouri of 1807 and in the Revised Statutes of 1825, and has been amended several times. In 1945 the section was reenacted, and the following was added: "and an action by an employee for the payment of unpaid minimum wages, unpaid overtime compensation or liquidated damages by reason of the nonpayment of minimum wages or overtime compensation, and for the recovery of any amount under and by virtue of the provisions of the Fair Labor Standards Act of 1938 and amendments thereto, said act being an act of Congress, shall be brought within two years after the cause accrued."

Prior to this amendment actions for minimum wages and overtime compensation would have fallen within the provisions of Section 1014. Plaintiffs insist that Section 1016 is unconstitutional and cite as authority the case of Republic Pictures Corp. v. Kappler, 8 Cir., 151 F. 2d 543, affirmed without opinion, 327 U.S. 757, 66 S.Ct. 523, 90 L.Ed. 991, rehearing denied, 327 U.S. 817, 66 S.Ct. 804, 90 L.Ed. 1040, in which a statute of Iowa attempting to place a six months limitation upon actions arising under the Fair Labor Stand-

ards Act was held unconstitutional. However, the limitation of the Iowa statute was confined to actions arising under the Fair Labor Standards Act, an act of Congress, and was held unconstitutional because it discriminated against rights created by Federal law.

There are no Missouri laws limiting hours of labor or fixing rates of pay with the exception of the act limiting the hours of labor of female employees during any week. For that reason the Missouri statute of limitations is a limitation only against actions arising under the Fair Labor Standards Act; but it seems to me that the mere fact that no actions may arise under the present Missouri laws does not bring it within the Republic Pictures Corp. case, supra. Section 1016 would be applicable if Missouri did have such laws or if in the future Missouri should enact any law to which it would apply. It is not directed solely against rights created by Federal law. I am, therefore, unable to agree with plaintiffs' contention that section 1016 is unconstitutional. Ott v. Freeman & Son, Inc., D.C., 68 F.Supp. 445.

■ Section 1016 provided no time limit within which to bring suit on causes of action that had already accrued. As a general rule statutes of limitation operate prospectively and not retrospectively in the absence of a clear legislative intent to the contrary, 34 A.J., Sec. 43; United States v. St. Louis, S. F. & T. R. Co., 270 U.S. 1, 46 S.Ct. 182, 70 L.Ed. 435, and if they propose to operate retrospectively, a reasonable period of time must be allowed within which to bring accrued causes of action. 34 A.J., Secs. 18, 21; Atchafalaya Land Co. v. F. B. Williams Cypress Co., 258 U.S. 190, 42 S.Ct. 284, 66 L.Ed. 559; Lamb v. Powder River Live Stock Co., 8 Cir., 132 F. 434; Randolph v. City of Springfield, 302 Mo. 33, 257 S.W. 449, 31 A.L.R. 612. Whether the period of time provided is reasonable is a fact ultimately to be determined by the court. Terry v. Anderson, 95 U.S. 628, 24 L.Ed. 365; Lamb v. Powder River Live Stock Co., supra; Randolph v. City of Springfield, supra. But the determination of the legislature

must be given great weight. Terry v. Anderson, supra.

■ It may be insisted that Art. 3, Sec. 29 of the Missouri Constitution of 1945, Mo.R.S.A., which provides that, except in certain specified cases, no law shall take effect until ninety days after adjournment of the session at which it was enacted, may be considered a period during which actions already accrued may be brought. It may be contended that this period, if reasonable, shall be considered in determining whether a statute is applicable to existing causes of action at the time it becomes effective. In Lamb v. Powder River Live Stock Co., supra, the court said [8 Cir. 132 F. 437]: "Not infrequently in adopting new statutes of limitation special provision is expressly made for enforcing existing rights of action, but a provision of that character was not needed in this instance. Under the Constitution of the State (article 5, § 19) the act of 1895, which contained no emergency clause, would not take effect for 90 days after its passage; a period which is practically the equivalent of the shortest limitation prescribed in the act. According to the decisions of many courts, a statute of limitation, the operation of which is postponed to an appointed time in the future, is effectual from the date of its enactment as public notice of its provisions and prospective operation, and, if it be not otherwise provided, operates to fix or designate the time which will elapse between its passage and its taking effect as the period within which to begin proceedings for the enforcement of such existing rights of action as will fall within the bar of the statute when it takes effect. (Citing cases). In the opinion of other courts such a statute does not effectually charge any person with notice of its provisions, or have effect in any other way, until the time appointed for it to go into full operation (Citing cases). The Supreme Court of Colorado does not seem to have spoken upon the question, and we do not deem it necessary to consider which of the opposing views is the better one, because both lead to the same ultimate conclusion in this case."

Without deciding whether in some cases the period between enactment and ninety

days after the end of the session at which enacted might be a reasonable period for bringing actions already accrued, and without deciding whether that period gives notice of the future operation of the statute, it is my opinion that the ninety days provided here was insufficient and unreasonable for bringing actions already accrued. A ninety day period was held insufficient with respect to the statute involved in the Lamb case, supra. In the case of many statutes, under the Missouri Constitution, there may be provided a considerably longer period than ninety days since laws will frequently be enacted considerably before the end of the session. But the act reenacting section 1016 was not signed until after the end of the session at which it was passed. It did not become law until that time, and the only period provided for bringing accrued causes of action was ninety days between signature and the effective date of the statute. Under all the circumstances I think that that was an unreasonable and insufficient time. Other courts have held that an even longer period of time was insufficient. McGahey v. Virginia, 135 U.S. 662, 708, 10 S.Ct. 972, 34 L.Ed. 304. I, therefore, hold that section 1016, Mo.R.S. 1939, as amended, Mo.R.S.A., is inapplicable to causes of action which had accrued at the time that it became effective. The motion to dismiss based on the Missouri statute of limitation is overruled.

■ We next come to the question of whether plaintiffs are entitled to the benefits of the Fair Labor Standards Act. Defendant insists that plaintiffs' employment falls within the exception as described in Administrative Bulletin No. 13 (see footnote 2); that long custom and practice in the maintenance and operation of switchboards of comparable types prompted the issuance of Bulletin No. 13; that it had a right to rely upon its interpretation of that Bulletin in fixing the hours of work and the rates of pay of its employees; and that admittedly the duties and responsibilities described and defined in the evidence bring plaintiffs clearly within the exception as defined in the Bulletin.

I am unable to agree with defendant that Administrative Bulletin No. 13 clearly describes and defines the conditions under which the plaintiffs worked at their respective stations. That Bulletin, after describing the conditions under which certain persons were not covered by the Act, used an example which, it seems to me, placed a limitation upon the conditions theretofore discussed. It stated that a "good example of this is the employee of a small telephone exchange operating a switchboard located in the employee's house." That Bulletin also stated that "In these cases, the nature of the employee's work involves long periods of inactivity which the employee may use for uninterrupted sleep, to conduct personal business affairs, to carry on a normal routine of living, etc."

Plaintiffs in this case were not operating switchboards in their own homes; they did not necessarily have long, uninterrupted sleeping periods, although there may have been times when that was true; they were not at liberty to conduct their personal business affairs or to carry on a normal routine of living; they were not permitted to leave the premises; they were not permitted to carry on any other activity. It was necessary that they be at their post of duty for a definite fixed period of time between given hours each night. Their services were absolutely at the command and under the control of defendant without any exception. It seems to me that there is a distinct difference between being employed as a telephone operator in one's own home and being employed in a regular business office of one's employer. If an operator is employed in her home, she may, when not engaged in operating the switchboard, go about the duties of her home, looking after the wants and needs of her family. That she certainly cannot do if she is away from her home, conducting the affairs of her employer in its own business office where she is subject to continuous call to duty whenever the patrons of her employer demand service.

■ Defendant also insists that during the period of time the Fair Labor Standards Act was in effect, numerous inspectors of the Wage and Hour Division inspected the offices of defendant and made no complaint about any violation of the law; that plaintiffs, themselves, never requested any

change in their working conditions or contended that they were entitled to overtime compensation or pay for the full eleven hours of service which they were devoting to the business of defendant; that the same practice and custom was carried on subsequent to the passage of the Fair Labor Standards Act that existed in the industry prior to the passage of the Act; and that these facts, of themselves, free defendant from the penalties of the Act. With those contentions I am unable to agree. It seems to me that the law was definite and clear; that defendant was getting the benefit of the services of the plaintiffs over a period of eleven hours for compensation of between eight and nine hours; that had it not been for the presence of plaintiffs during all of this period, it would have been necessary for defendant to employ some other person to perform the same duties. Defendant has cited cases in which the courts have held that certain types of employees who were *standing by* waiting to be called to perform some duty were not in compensatory service. In all of those cases, however, such persons were compensated for such service as they actually rendered to the employer over and above their regular duty; that is, when a fireman who may have slept upon the premises ready for call was actually called out, he was compensated for that time. We do not have such a situation here. There is nothing in the evidence to indicate exactly how much time either plaintiff worked in attendance upon the switchboard. It is admitted, however, that regardless of whether they worked in excess of the time for which they were compensated they did not receive any compensation for that additional time. That alone distinguishes this case from the cases cited by defendant.

█ Lastly, defendant contends that plaintiffs have failed to prove their damages. Apparently, in making that contention, defendant seeks to confine plaintiffs' recovery to compensation for time actually devoted to the switchboard in excess of the time for which they were compensated. Of course, the evidence does not show that fact; but that is not the theory upon which the court is deciding the case. Plaintiffs seek to recover compensation for the full

eleven hours during which they were on duty, and with that contention I agree.

It is my conclusion that plaintiffs were within the provisions of the Fair Labor Standards Act; that they were entitled to compensation for the full eleven hours during which they were on duty; and that they are entitled to compensation for all hours worked in excess of 40 hours per week, such compensation to be computed on the basis of one and one-half times the rate at which they were paid during the period those hours were worked. Mrs. Conwell is entitled to recover $1,331.98, and Miss Pinkepank $1,121.97.

█ Plaintiffs also seek to recover liquidated damages equal to the amount of overtime compensation found to be due them. Prior to the passage of the Portal-to-Portal Act, an award of liquidated damages was mandatory under the provisions of section 216 of the Fair Labor Standards Act. However, section 260 of the Portal-to-Portal Act, supra, vests in the court discretion to award or to deny liquidated damages where the employer has proved his good faith in failing to pay overtime compensation. Apparently, the tour of duty practice followed in this case was an old one with respect to so-called country telephone exchanges. No complaint was ever made by the employees, and the inspectors of the Wage and Hour Division never made any complaint to defendant. Defendant testified that it had relied upon Administrative Bulletin No. 13 in following the established practice. While the court disagrees with the construction placed upon the Bulletin by defendant, I am not able to say that there was any lack of good faith involved. After the passage of the Fair Labor Standards Act defendant began compensating all of its employees, including plaintiffs, on an hourly basis. It was only after the employees of defendant were organized and contracts negotiated between the union and defendant that the question of overtime and under-compensation with respect to plaintiffs arose. Under the circumstances no liquidated damages will be awarded. The amount of plaintiffs' recovery will be limited to the overtime compensation due them and to an attorney's fee.

Plaintiffs requested an attorney's fee of $2,500. This figure apparently was based upon the total recovery sought, that is, $2,453.95 in overtime compensation plus an equal amount in liquidated damages. As previously stated, no liquidated damages will be awarded. In any case the fee allowed should bear some relation to the amount of work performed by counsel and to the amount of recovery. The suit was filed in January 1947. The questions of law involved have heretofore been discussed. Counsel took depositions and had an audit made of defendant's books to determine the number of hours for which plaintiffs had not been compensated. Counsel appeared in court on several occasions, including a pre-trial conference, and for the argument of motions and other preliminary matters. The trial of the case required slightly more than one day. Considering all of these elements, the court considers an attorney's fee of $1,000 to be reasonable.

It is therefore ordered, adjudged, and decreed that plaintiffs have and recover from defendant $2,453.95 in overtime compensation, an attorney's fee of $1,000, and the costs of the action.