Frank M. OCKERMAN, individually
and on Behalf of all others
similarly situated,

v.

MAY ZIMA & CO., et al.

No. 3:85–1190.

United States District Court,
M.D. Tennessee,
Nashville Division.

Jan. 7, 1992.

---

John W. Wagster, Hollins, Wagster & Yarbrough, Nashville, Tenn., Richard H. Adams, Anthony Robert, Richard O. Conner, Jr., Orlando, Fla., for plaintiff.

Michael L. Dagley, Farris, Warfield & Kanaday, Nashville, Tenn., Mary K. Simpson, Thomas J. Guilday, J. Stephen Menton, Huey, Guilday, Kuersteiner & Tucker, Tallahassee, Fla., for defendant.

## MEMORANDUM

JOHN T. NIXON, Chief Judge.

Pending before the Court in the above styled action is defendant May Zima & Co.'s (May Zima) motion for summary judgment on the issues of plaintiffs' fraud created the market theory, plaintiffs' aiding and abetting and conspiracy theories as applied to May Zima, and the statute of limitations issue.

### I. BACKGROUND

After substantial discovery, the facts pertinent to the resolution of the issues today viewed in a light most favorable to the non-movant plaintiffs are as follows.

This securities fraud class action arises out of the issuance of $5,500,000.00 City of Bowling Green, Kentucky, First Mortgage Revenue Bonds, Series 1983, on August 4, 1983, the proceeds of which were intended

to acquire, construct and equip a retirement village [1] in Bowling Green, Kentucky. From the proceeds of the bonds, the promoters succeeded in substantially building and furnishing the project. Soon thereafter, however, the project failed. The retirement center never opened for business and never received one deposit. The indenture trustee declared the project in default in July of 1985, and the partnership that owned the project filed for bankruptcy on August 30, 1985. In January of 1989, the project was sold for $1,350,000.00. As of this date the bondholders have recouped only $485,382.11 of their original $5,500,-000.00.

Defendant May Zima was the feasibility consultant for the project. It prepared the Financial Feasibility Study in which it concluded that the data and assumptions upon which the success of the project was predicated were reasonable and that the project would most likely succeed. Prior to the Bowling Green project, May Zima had provided several health care facilities with auditing, accounting, management consulting and feasibility study services. From the deposition testimony, however, it appears that many of the May Zima employees who worked on the project had little or no experience with retirement facilities and the employees who had such experience provided little input into the Bowling Green feasibility study. May Zima's handling of the Bowling Green feasibility study also lacked proper oversight or direction.

The two chief promoters of the Bowling Green project were Thomas Hunter and Bryson Hill. Hunter had worked as a health educator for the Tennessee Department of Public Health, for the Metro Health Department, for the Middle Tennessee Health Planning Agency, and as a consultant for hospitals and nursing homes. Hill had been president and part owner of Hill Guthrie Properties which owned and managed twenty nursing homes in Alabama, Georgia, South Carolina and Florida. Hunter and Hill were also collaborators in the development of two retirement centers begun shortly before the Bowling Green project in the towns Hendersonville and Jackson, Tennessee.

The Hendersonville and Jackson projects were substantially identical to the initial plans for the Bowling Green project. At the time of the Bowling Green offering, the Hendersonville and Jackson projects were in trouble. Though these projects were not scheduled to open until after the Bowling Green offering, construction delays and marketing failures plagued the projects even at this stage. For instance, several of the consultants on the projects had indicated to the promoters that pre-opening marketing would be key to their success. The Hendersonville project had only received two deposits as of the day before the Bowling Green opening. The defendants failed to disclose any of the related projects' problems to the Bowling Green investors.

In the literature surrounding the Bowling Green offering, Hill was presented as the "money man" in the deal and his companies First American Management Co. and First American Marketing Co. were to participate as the management and marketing firms for the project. What was not disclosed was Hill's questionable financial status at the time of the offering. Hill had sold the nursing home company for a substantial profit but received from the buyer not cash, but a long term promissory note. Though Hill's assets were substantial, his commitments of working capital and guarantees to other retirement facilities in which he was involved far outstripped his assets and thereby gravely undermined his purported ability to provide working capital and marketing funds for the Bowling Green project. In 1984, only a year after the bond offering, Hill filed for bankruptcy.

Other shortcomings of the plans for the Bowling Green project included the occupancy projections and the rental rates. As

---

**1.** At the outset, it is important to note that a retirement center differs from a nursing home in that generally the former collects revenues on a rental basis and requires no licensing from the state, while the latter collects revenues on an up front fee basis and is usually licensed by the state.

the plans for the project developed, the promoters continued to raise both based upon the funds necessary to cover the project's debt service rather than the economic circumstances. The promoters and May Zima raised the projected occupancy in the first year from sixty-six percent to seventy percent despite the fact that the Jackson and Hendersonville projects had failed to attract pre-opening subscriptions. The promoters made this projection notwithstanding the fact that May Zima was unable to cite a retirement facility that had reached seventy percent occupancy in its first year. The monthly rental rates, as originally planned by Hunter and Hill, were to be $580 for a studio, $630 for a studio deluxe, and $790 for a two bedroom. According to May Zima's research and fieldwork, less than two percent of all apartments in the Bowling Green area charged more than $300 per month and the high rental rates were going to be the greatest obstacle in marketing the facility. Nevertheless, in order to meet the financing demands, the promoters raised the monthly rental rates as disclosed in the final offering circular to $800 per person for a four person semi-private room, $850 for an efficiency, $900 for a one bedroom, and $975 for a two bedroom. The offering circular indicated that apartments could provide competition for the retirement village units, but failed to disclose the vast difference in rental rates between apartments and the units at the Bowling Green project. Prospective residents at the Hendersonville project complained of the high rental rates at that facility prior to the Bowling Green bond offering. In addition, financing demands caused the promoters, contrary to their wishes, to charge entry fees at all three facilities even before the rent payments began. Even with these glaring obstacles to marketing, the promoters proceeded with the Bowling Green project.

Other obstacles to marketing consisted of the deficient amenities and services that the prospective residents of the Bowling Green facility would receive for their high rental rates. The offering circular boasted that the facility would provide, in addition to living quarters, a central dining room, kitchen, laundry, exercise room, whirlpool, swimming pool with dressing rooms, a library, and a day room. At additional cost, three meals a day were available, with special meals and dietary programs, as well as weekly housekeeping, commercial laundry services, and transportation to churches, shopping, local doctors' offices, clinics and community recreational facilities. Also, a twenty-four hour emergency call system from all bedrooms and baths monitored by a staff person was available. This description of the Bowling Green facility as it appeared in the offering circular on its face, however, gave a roseate picture of the services and amenities that were actually to be provided.

The rooms sizes were to be as follows: 630 square feet for four people in the semi-private units, 380 square feet for the efficiencies, 529 square feet for the one bedrooms, and 698 square feet for two bedrooms. The consultants on the project knew that these sizes resembled a nursing home and were too small for a retirement village. Similar to the occupancy projections and rental rates, the building's inadequateness stemmed from financing concerns. In deposition testimony, the architect of the Bowling Green facility indicated that the promoters gave him a budget within which he was to design the retirement village instead of asking him what the necessary funding would be to build a proper facility.

Differences between the law in Kentucky, the site of the Bowling Green project, and the law in Tennessee, the site of the Hendersonville and Jackson projects, caused the promoters to curtail the Bowling Green facility's nursing service. Originally, the promoters desired to provide the facility's residents with a nurse on location. Kentucky law, however, unlike Tennessee law, permits nurses on location only at facilities that obtain a certificate of need. The Bowling Green project had not. In the offering circular, May Zima and the promoters omitted the fact that they cut out the nursing service shortly before the bond offering. Such a service was important to the viability of a facility that was to charge

monthly rental rates in excess of $800 in an area where rental rates rarely exceeded $300.

Similarly, although Hunter wished each living unit to have a full kitchen, the bond counsel opined that, if the units had kitchens, the bonds would not qualify for tax-exempt status under the Internal Revenue Code. Therefore, the final plans for the project provided only two hot-plate burners and an under the counter refrigerator in only some of the units. Again, the promoters compromised marketability for compliance with the applicable law without reassessing the overall feasibility of the project.

Further, the promoters purchased more land than was necessary for the Bowling Green project. Although the Hendersonville and Jackson projects had been built upon approximately seven or eight acres, the Bowling Green project bought nineteen acres. The promoters intended that condominiums or independent living units be built upon the excess land in the future, but did not disclose this to the investors.

Plaintiff Ockerman filed this action on October 15, 1985 alleging, among other things, that the defendants conduct surrounding the sale of the Bowling Green bonds was in violation of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 promulgated thereunder.

## II. ANALYSIS

In light of the facts viewed most favorably toward plaintiffs, as described above, defendant May Zima contends that it is entitled to summary judgment on the issues of plaintiffs' fraud created the market theory, plaintiffs' aiding and abetting and conspiracy theories as applied to May Zima, and the issue of the statute of limitations. Plaintiffs argue that material issues of fact exist with respect to each of these issues.

### A. Summary Judgment Standard

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986), the Supreme Court explained a district court's function in ruling upon a motion for summary judgment:

By it's very terms, [the Rule 56(c)] standard provides that the mere existence of *some* alleged actual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.

As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted....

More important for present purposes, summary judgment will not lie if the dispute about a material fact is "genuine," that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. 477 U.S. at 247–8, 106 S.Ct. at 2510. (emphasis in original) (citations omitted).

It is likewise true that "[i]n ruling on a motion for summary judgment, the court must construe the evidence in its most favorable light in favor of party the opposing the motion and against the movant. Further, the papers supporting the movant are closely scrutinized, whereas the opponent's are indulgently treated. It has been stated that: 'The purpose of the hearing on the motion for such a judgment is not to resolve factual issues. It is to determine whether there is any genuine issue of material fact in dispute.'" *Bohn Aluminum & Brass Corp. v. Storm King Corp.*, 303 F.2d 425, 427 (6th Cir.1962) (citations omitted).

Once the movant has satisfied their burden of showing through the pleadings, depositions, affidavits and answers to interrogatories that there is no genuine issue as to

a material fact, Rule 56(c) mandates the entry of summary judgment against the non-movant who fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which the non-movant will bear the burden of proof at trial, particularly when that party has had an opportunity to conduct discovery. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Therefore, the Court determines below whether defendant May Zima has met its burden of showing there is no genuine issue as to a material fact with respect to plaintiffs' fraud created the market theory, plaintiffs' aiding and abetting and conspiracy theories as applied to May Zima, and the statute of limitations issue; and, if so, whether plaintiffs have failed to make a showing sufficient to establish the existence of an element essential to their case.

### B. Fraud Created the Market Theory

The elements of a classic 10b–5 misrepresentation action are: (1) that the defendant made a false representation of a material fact, (2) knowing its falsity and intending the plaintiff to rely on it, (3) the plaintiff justifiably relied upon the misrepresentation and (4) suffered damage as a result. *Dupuy v. Dupuy*, 551 F.2d 1005, 1014 (5th Cir.1977). Because reliance is often difficult to prove in class action securities fraud cases, courts often shift the burden of proof by establishing a presumption of reliance under certain circumstances. *See,*

*e.g., Affiliated Ute Citizens v. United States*, 406 U.S. 128, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972) (establishing the presumption of reliance in omission cases where the plaintiffs could justifiably expect that the defendants would disclose material information); *Basic v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 991–92, 99 L.Ed.2d 194 (1988) (adopting a presumption of reliance, known as "fraud on the market," in cases where the securities in question are traded on an efficient market and therefore the investors justifiably rely directly on the price of the security as an accurate reflection of its value and thereby indirectly on the official public representations).

### 1. Shores and Its Progeny

In *Shores v. Sklar*, 647 F.2d 462 (5th Cir.1981), the Fifth Circuit first expounded the "fraud created the market" presumption of reliance theory that plaintiffs ask the Court to employ in the instant case.[2] Ruling on a motion to dismiss, the *Shores* court held that in a 10b–5 action, when the securities were traded on an inefficient market, a plaintiff is entitled to a presumption of reliance if the securities could not have been marketed at all but for the fraudulent scheme or course of business.[3] *Id.* at 469. The court based its holding on the language of sections (a) and (c) of Rule 10b–5 which makes it unlawful for any person to employ any scheme or engage in any course of business in connection with the sale of any security that would operate as a fraud upon another person.[4] Since

---

**2.** *Shores* was an early circuit court decision in the development of the more general "fraud on the market" theory which the Supreme Court eventually adopted in *Basic.* The threshold distinction between the "fraud on the market" theory and the "fraud created the market" theory is that the former applies when the securities in question were traded on an efficient market, such as the New York Stock exchange; whereas the latter applies when the securities were not traded on such an efficient market. *Abell v. Potomac Ins. Co.*, 858 F.2d 1104, 1121 (5th Cir. 1988).

**3.** Under this holding, the *Shores* court reversed the district court's dismissal of the plaintiffs' 10b–5 action. The district court in *Shores* had dismissed the plaintiffs' 10b–5 action because the plaintiffs admitted that they did not rely on the offering circular.

**4.** Rule 10b–5 provides in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, ...

(a) to employ any device, scheme or artifice to defraud,

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240 10b–5 (1990).

those sections do not speak of the misrepresentations that section (b) of Rule 10b–5 does, it is not necessary to prove reliance on the misrepresentations to prevail in a 10b–5 fraud action. Rather, the plaintiff will be presumed to rely upon the bonds availability on the market as an indication that they are genuine and not the product of a fraudulent scheme or course of business. *Id.* at 469–70.

The *Shores* court held that the facts as alleged in the complaint, if proven, could show that the securities in question could not have been brought to market but for the defendants' fraudulent scheme. *Id.* at 468–69. The *Shores* complaint alleged, among other things, that the offering statement omitted a pending SEC action against the promoters, mischaracterized one promoter as having extensive real estate holdings, misportrayed another promoter as an experienced developer, and incorporated a false and misleading financial statement. Thus, the *Shores* court operated upon the presumption that had the promoters disclosed these facts, indeed if they were truly facts, the bonds in question could not have been marketed at any price or interest rate. *Id.* at 470–71.

Several circuit court decisions subsequent to *Shores* have applied its "marketability" test, often at the summary judgment or post-trial stage. *See, e.g., Abell v. Potomac Insurance Co.,* 858 F.2d 1104 (5th Cir.1988) (appealed judgment n.o.v.); *Ross v. Bank South, N.A.,* 885 F.2d 723 (11th Cir.1989) (summary judgment).

The *Abell* case involved a bond offering where there was evidence indicating initial feasibility study done by a nationally recognized accounting firm had made negative conclusions about the prospective enterprise, and the chief promoter of the enterprise had made a suspicious real estate transaction that enabled him to profit from the proceeds of the bond offering and also appear to have two million dollars of his own money at risk in the enterprise when he did not. The promoters failed to disclose these facts, which the plaintiffs claimed would have made the bonds entirely unmarketable under *Shores* and thus

entitled them to a presumption of reliance. The *Abell* court disagreed. It read *Shores* as holding that "securities meet the test of 'not entitled to be marketed' only where the promoters knew the enterprise was patently worthless" or a hoax. *Abell,* 858 F.2d at 1122. The *Abell* court emphasized the fact that the bonds in question remained near par value for several years after the enterprise disclosed the accurate version of its beginning and after the commencement of the lawsuit indicated that the bonds would have been marketable even if the undisclosed information had been disclosed. *Id.*

In *Ross,* a case factually similar to the instant case, the bond offering in question was intended to finance a residential and medical facility for the elderly. The plaintiffs claimed that since consultants had informed the promoters that the prices of the apartment units in an earlier version of the project were as high as the market would bear, the promoters subsequent raising of those prices, even though disclosed, made the apartments unmarketable, and thus the project doomed from the outset. In addition, the plaintiff alleged that the successful pre-opening marketing described in the offering circular was a sham, and that in reality very few authentic deposits had been put down on apartment units. As in *Abell,* the plaintiffs also conceded lack of reliance on the offering circular, but argued that under *Shores* the bonds in question could not have been marketed but for the promoters' fraudulent scheme. The *Ross* court disagreed, holding that the plaintiffs had failed to adduce sufficient evidence to create a genuine issue as to whether the bonds were inherently unmarketable. *Ross,* 885 F.2d at 731. The court pointed out that the higher prices of the revised version of the deal were structured much differently and thus could not be compared to the earlier version's prices. Further, the revised pricing, like many of the other facts about which the plaintiffs complained, was disclosed, and still the bonds were marketable. The court stated that the possible inference from the evidence that the successful pre-marketing was a sham did not create a jury issue as

to the bonds' marketability but for the alleged fraud. *Id.*

## 2. An Alternative to *Shores*

The Sixth Circuit has not held one way or the other on whether the *Shores* presumption of reliance test should apply to allegedly fraudulent schemes to bring securities to market in non-efficient markets.[5] If this Court today were to apply *Shores,* the Court would probably find that the Bowling Green bond issue was not unmarketable but for the alleged fraudulent scheme of May Zima and the other defendants. Similar to the *Ross* court, the Court would likely find that since several deficiencies in the project were disclosed, most notably the extremely high rental rates, and still the bonds were marketed, the defendants' misrepresentations about other aspects of the projects would not create a jury issue as to whether the bonds could have been marketed but for the defendants alleged fraudulent scheme. Because the Court finds that the *Shores* test of marketability but for the alleged fraudulent scheme is misguided, however, the Court re-examines the presumption of reliance under Rule 10b–5 in the non-efficient market context.

The *Shores* decision is commendable in its desire to enforce Congress' intent to maintain integrity in the securities marketplace, of course, but its weakness lies in the rule it fashions to reach that end. To begin with, Rule 10b–5 makes no mention of "marketability." Further, any court's attempt as measuring a given security's marketability but for the alleged fraudulent scheme is a highly speculative and precarious undertaking. As the instant case, *Abell,* and *Ross* demonstrate, on non-efficient markets, even high risk enterprises with obvious deficiencies in business judgment are marketable in the absolute sense. Moreover, the *Shores* test, applied strictly, could produce the incongruous result of plaintiff victims of a truly fraudulent scheme not receiving a presumption

reliance only because the bonds could have been marketed even if no misrepresentations, except for perhaps the promoters' fraudulent intent, had been made.

Instead of basing a presumption of reliance in non-efficient market cases upon a finding of unmarketability but for the alleged fraud, the Court adopts an analysis that concentrates more on the intent of Rule 10b–5, the express language of Rule 10b–5 and the appropriateness of presuming reliance in certain cases.

■ The Supreme Court has stated that the federal securities acts were designed "to protect investors against fraud and ... to promote ethical standards of honesty and fair dealing. *See* H.R.Rep. No. 85, 73d Cong., 1st Sess., 1–5 (1933)." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 1382, 47 L.Ed.2d 668 (1976). In furtherance of that goal, the Securities and Exchange Commission promulgated, under Section 10(b) of the Securities and Exchange Act of 1934, Rule 10b–5, which provides in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, ...

(a) to employ any device, scheme or artifice to defraud,

(b) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person,

in connection with the purchase or sale of any security.

17 C.F.R. § 240 10b–5 (1990).[6] The Supreme Court has held that, where an effi-

---

**5.** In *Freeman v. Laventhol & Horwath,* 915 F.2d 193, 199–200 (6th Cir.1990), the Sixth Circuit acknowledged the fraud created the market theory developed in *Shores* and its progeny but declined to make any holding under it because the court determined that issue was not before it.

**6.** The courts have found an implied civil cause of action under Section 10(b) and Rule 10b–5 promulgated thereunder, *Hochfelder,* 96 S.Ct. at

cient market for a particular security exists, the fact-finder may presume the plaintiffs' reliance on the misrepresentations because even if the plaintiff did not rely directly on the defendants' misrepresentations, the plaintiff relied on those statements indirectly by relying on the efficient market to evaluate those representations and reflect its evaluation of them in its market price. Thus, a plaintiff is presumed to rely upon the integrity of the efficient market. *Basic v. Levinson*, 485 U.S. 224, 108 S.Ct. 978, 991–92, 99 L.Ed.2d 194 (1988). As discussed above, the *Shores* court, which was an early circuit court decision in the development of the "fraud on the market theory" adopted in *Basic*, had gone further than the Supreme Court eventually did in *Basic* by holding that in the non-efficient market context reliance could be presumed if the securities could not have been marketed but for the alleged fraudulent scheme.

In the Court's view, the *Shores* court would have done better by simply reasoning that parts (a) and (c) of Rule 10b–5 are intended to enable a court to presume that the purchaser (or seller) of securities relied on the integrity of the defendants' scheme or course of business in issuing the securities. The Court acknowledges that this

reasoning greatly diminishes the importance of the reliance element in 10b–5 securities fraud litigation since any claimant will contend that they relied on not only the defendants' misrepresentations but also upon the integrity of the course of business taken by the defendant promoters and professionals.[7] Nevertheless, the Court believes that this reasoning to be more in line with the language and intent of Rule 10b–5 than the reasoning in *Shores*, and that its holding will enable courts to make fair evaluations about just liability for fraudulent securities schemes instead of applying the less accurate *Shores* test and attempting to evaluate something so esoteric as when a security would be unmarketable but for the alleged fraudulent scheme.

■ Therefore, the Court declines to apply *Shores* and holds that, at the summary judgment stage, the defendants in a 10b–5 securities fraud action are not entitled to summary judgment even if the plaintiffs in the action concede that they did not rely on the specific misrepresentations of the defendants.[8] Rather, the plaintiffs, under Rule 10b–5, are presumed to rely on the integrity of the defendants' scheme and course of business in issuing the securities in question.[9] Since this is a new proposi-

---

1382, upon which plaintiffs base their claims today.

**7.** Of course, the Court would not read Rule 10b–5 to allow claims to proceed solely on allegations of a fraudulent scheme or course of conduct under only parts (a) and (c). Misrepresentations or omissions as described in (b) are inseparable from fraud. Rather, the Court interprets Rule 10b–5's separate listing of fraudulent schemes and courses of business as enabling investors to rely on the good faith and integrity of the schemes and courses of business surrounding securities transactions. Indeed, this proposition is less of a leap from the express language of Rule 10b–5 than the Supreme Court's reading of reliance on the integrity of the market into Rule 10b–5 in *Basic*, 108 S.Ct. at 990–91.

When discussing securities issues, courts often speak either of Congress' intention to protect investors through the federal securities acts or of Congress' lack of intention to create an insurance scheme for investors through the federal securities laws. The Court today recognizes both these competing interests in the inter-

pretation of federal securities laws, but does not favor one over the other. Rather, the Court seeks to interpret the plain language of law, so the interpretation does not become as muddled as the Court believes it has in the strain of cases under *Shores*.

**8.** In this action, plaintiffs did not concede lack of reliance on the misrepresentations. Thus, if plaintiffs are not entitled to rely on the integrity of the defendants' scheme and course of business, and not entitled to the *Shores* presumption, reliance on the misrepresentations will be an element at trial upon which plaintiffs would bear the burden of proof.

**9.** The presumption is still rebuttable if defendants show that plaintiffs intentionally refused to investigate in disregard of a risk known to him or so obvious that the plaintiffs must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. *Dupuy v. Dupuy*, 551 F.2d 1005, 1020 (5th Cir.1977). Thus, defendants could rebut the presumption by showing plaintiff intentionally refused to investigate the defendants who he should have known were essentially crooked.

tion of law in an unexplored area, however, the Court below certifies this issue for interlocutory appeal.

### C. Aiding and Abetting and Conspiracy

Defendant May Zima argues that it is entitled to summary judgment on plaintiffs' claim that it should be held liable under an aiding and abetting or conspiracy theory.

■ Secondary liability under Rule 10b–5 and other securities laws derives from concepts borrowed from the common and the criminal law, namely, aiding and abetting and conspiracy. *Securities and Exchange Commission v. Coffey*, 493 F.2d 1304, 1316 (6th Cir.1974). Although plaintiffs state that the elements for aiding and abetting and conspiracy in the 10b–5 context are the same and some case law uses the terms interchangeably, *see Kardon v. National Gypsum Co.*, 69 F.Supp. 512, 514–15 (E.D.Pa.1946), Louis Loss, Fundamentals of Securities Regulation 1187 (1983), the Sixth Circuit requires the finding of an agreement to accomplish a wrongful purpose in order to conspiracy under the securities laws. *Coffey*, 493 F.2d at 1316. Since plaintiffs do not allege or show any evidence that May Zima had an agreement with any of the other defendants, the Court addresses only the aiding and abetting theory.

In the Sixth Circuit, the elements of aiding and abetting a securities law violation, although not inflexible, are:

(1) Some other party has committed a securities law violation,

(2) The defendant had *general awareness* that his role was part of an overall activity that was improper, and

(3) The defendant *knowingly and substantially assisted* in the violation.

*Id.* at 1316 (emphasis added); *see also Moore v. Fenex, Inc.*, 809 F.2d 297, 303 (6th Cir.1987). May Zima argues that *Abell*, which describes essentially the same aiding and abetting test as *Coffey*, outlines the proper high level of scienter required for aiding and abetting and that plaintiffs have failed to present any evidence from which a jury could conclude that May Zima had the requisite scienter to be found liable on an aiding and abetting theory.

In *Abell*, the circuit court held that "general awareness" for purposes of aiding and abetting in a Rule 10b–5 action means knowledge, though it may be adduced from reckless conduct. In the instant case, plaintiff has come forth with evidence from which a jury could conclude that May Zima acted recklessly.

■ The *Abell* court went on to define "knowing and substantial assistance" by quoting from its previous decision in *Woodward v. Metro Bank*, 522 F.2d 84 (5th Cir.1975). In *Woodward*, the circuit court outlined a sliding scale definition of "knowing and substantial assistance."

> When it is impossible to find any duty of disclosure, an alleged aider-abettor should be found liable only if scienter of the high "conscious intent" variety can be proved. Where some special duty of disclosure exists, then liability should be possible with a lesser degree of scienter.... In a case combining silence/inaction with affirmative assistance, the degree of knowledge required should depend on how ordinary the assisting activity is in the business involved. If the evidence shows no more than transactions constituting the daily grist of the mill, we would be loathe to find 10b–5 liability without clear proof of intent to violate the securities law. Conversely, if the method or transaction is atypical or lacks business justification, it may be possible to infer the knowledge necessary for aiding and abetting liability. In any case the assistance must be substantial before liability can be imposed under 10b–5.

*Id.* at 97. Applying this analysis, the *Abell* court determined that the underwriters' counsel in the case had merely performed "grist of the mill" services for the bond offering, and thus held the counsel not liable because no evidence suggested a "conscious intent" to violate securities laws, even though counsel made several material changes to the offering statement

without asking its clients why they should be made and knew that one of its clients was under SEC investigation. *Abell*, 858 F.2d at 1127; *see also IIT, An International Investment Trust v. Cornfeld*, 619 F.2d 909, 925–26 (2d Cir.1980) (Friendly, J.) (holding that accounting firm did not knowingly render substantial assistance). Because the Court finds that in the instant case May Zima performed "grist of the mill" services in preparing the financial feasibility study, the Court holds that, in order to withstand summary judgment on their aiding and abetting theory, plaintiffs must present sufficient evidence for a jury to infer that May Zima had a "conscious intent" to assist in the violation of securities laws. No such evidence exists on the summary judgment record, and therefore, May Zima is entitled to summary judgment on plaintiffs' aiding and abetting theory.

### D. Statute of Limitations

■ Ruling unfavorably on another defendant's motion to dismiss, the Court previously determined that the Tennessee Blue Sky Law provision of section 48–2–122(h) of the Tennessee Code Annotated provides the applicable statute of limitations for plaintiffs' Rule 10b–5 action.[10] *See Ockerman v. May Zima & Co.*, 694 F.Supp. 414, 416 (M.D.Tenn.1988). At that time, the Court indicated that the facts of the case were not sufficiently developed to apply the statute. The Court now applies the statute below.

Section 48–2–122(h) provides as follows: No action shall be maintained under this section unless commenced before the expiration of two (2) years after the act or transaction constituting the violation or the expiration of one (1) year after the

discovery of facts constituting the violation, or after such discovery should have been made by the exercise of reasonable diligence, whichever comes first.

Plaintiffs filed the instant action on October 15, 1985. The Bowling Green bonds were issued on August 3, 1983. Plaintiff's action was therefore filed more than two years after defendant May Zima's alleged violations of section 10(b) and Rule 10b–5. Thus, plaintiffs' claims against May Zima are time-barred.

Plaintiffs do not dispute that the two-year absolute bar limitation, if applied, would bar their 10b–5 action. Rather, plaintiffs argue that the Court should borrow the three year common law fraud statute of limitations to this 10b–5 action as Judge Higgins did in *Nichols v. Merrill Lynch, Pierce, Fenner & Smith*, 706 F.Supp. 1309, 1321 (M.D.Tenn.1989). In the alternative, plaintiffs argue that the equitable tolling doctrine, which tolls the commencement of the running of limitation period until plaintiffs knew or should have known of their cause of action, should apply.

Judge Higgins' opinion in *Nichols* recognized the Court's earlier decision in this case and recognized that the Court's application of the analogous state Blue Sky Law limitations period was the majority approach of federal courts. *Id.* at 1320–21. Nevertheless, in a lengthy and thoughtful opinion, Judge Higgins opined that, based upon certain language in *Carothers v. Rice*, 633 F.2d 7 (6th Cir.1980), a case which found the limitations period in the Kentucky Blue Sky Law to apply to a 10b–5 action, the Sixth Circuit would not apply the Tennessee Blue Sky Law limitations period, but instead would apply the three

---

**10.** Since the Court's determination that the analogous State Blue Sky Law limitations period applied to plaintiffs' 10b–5 claims, the Supreme Court has overruled the approach of applying limitations period of the most analogous state law to 10b–5 claims. *See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, —— U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) (decided June 19). However, section 1126(a) of the recently passed and signed Comprehensive Deposit Insurance Reform & Taxpayer Protection Act of 1991, formerly Senate Bill 543, pre-

vents courts from applying *Lampf* retroactively. Specifically, the section states:

Section 1226 LIMITATIONS ON SECURITIES PRIVATE RIGHTS OF ACTION
(a) EFFECT ON PENDING CAUSES OF ACTION—The limitation for any private civil action arising under § 10(b) of the Securities Exchange Act of 1934 that was commenced on or before June 19, 1991, shall be the limitation provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991.

year common law fraud statute of limitations. *Nichols,* 706 F.Supp. at 1321. Indeed, federal district courts in Tennessee are split as to which state statute of limitations is to be borrowed for purposes of 10b–5 actions. *See Media General, Inc. v. Tanner,* 625 F.Supp. 237 (W.D.Tenn.1985) (applying the common law fraud limitations period); *contra Haney v. Dean Witter Reynolds, Inc.,* Docket No. CIV–1–85–531 (E.D.Tenn. August 20, 1986) (available on Westlaw, 1986 WL 21340) (applying analogous state Blue Sky Law limitations period). At this time, the Court maintains its holding that the Tennessee Blue Sky Law limitations period applies because it is the most analogous state statute of limitations. *See Herm v. Stafford,* 663 F.2d 669, 682 (6th Cir.1981); *Holmberg v. Armbrecht,* 327 U.S. 392, 395, 66 S.Ct. 582, 584, 90 ·L.Ed. 743 (1946); Harold S. Bloomenthal, Securities Law Handbook § 25.02[1] (1990). Since this is an issue upon which reasonable minds differ, however, the Court below certifies this question also for interlocutory appeal.

■ Plaintiffs' equitable tolling argument also fails. Equitable tolling, in the Sixth Circuit, will apply to 10b–5 actions under either one of two situations:

First, the doctrine will toll the running of the statute of limitations where the fraud goes undiscovered even though the defendant does nothing to conceal it. The plaintiff, however, must exercise due diligence in attempting to uncover the fraud. In the second situation in which equitable tolling applies, the fraud goes undiscovered because the defendant has taken positive steps after commission of the fraud to keep it concealed. This type of fraudulent concealment tolls the limitations period until actual discovery by the plaintiff.

*Suslick v. Rothschild Securities Corp.,* 741 F.2d 1000, 1004 (7th Cir.1984). Plaintiffs make neither the argument that they exercised due diligence in attempting to uncover defendants alleged fraud nor the argument that defendants took positive steps to conceal their fraud. They make only the conclusory statement that equitable tolling should apply. After reviewing the summary judgment record, the Court finds no facts to support the application of the equitable tolling doctrine. Therefore, the Court rejects plaintiffs equitable tolling argument.

### E. Interlocutory Appeal Under 28 U.S.C. § 1292(b)

Section 1292(b) of Title 28 of the United States Code, provides:

When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is a substantial difference of opinion and that immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

28 U.S.C. § 1292(b). The authors of this provision intended it to be used in protracted and expensive litigation such as is now before the Court.[11] *See* Report of the Committee of the Judicial Conference of the United States, 1958 U.S.Code Cong. & Admin.News 5260–5261; 16 Charles A. Wright, et al., Federal Practice and Procedure § 3929 (1977).

In the order that accompanies this memorandum, the Court states that all these criteria have been fulfilled. As is apparent from this memorandum, the issues of which state statute of limitations to borrow, and whether to apply the Fifth Circuit's "fraud created the market" theory in

---

**11.** This case originated in 1985 and the number of docket entries in this action is rapidly approaching nine-hundred.

the instant action are "controlling question[s] of law," (2) "as to which there is a substantial ground for difference of opinion," and (3) "an immediate appeal may materially advance the ultimate termination of th[is] litigation." Charles A. Wright, at § 3929. Thus, these issues are appropriate for interlocutory appeal.

## III. CONCLUSION

For the above reasons, the Court denies May Zima's motion for summary judgment on plaintiffs' fraud created the market theory, grants May Zima's motion for summary judgment on plaintiffs' aiding and abetting and conspiracy theories as applied to May Zima, and grants May Zima's motion for summary judgment on the statute of limitations issue. Because two of these issues are appropriate for interlocutory appeal, the Court additionally certifies those issues for interlocutory appeal.