Frank M. OCKERMAN, individually and on behalf of all others similarly situated, Plaintiff–Appellant (92–5265), Plaintiff–Appellee,

v.

MAY ZIMA & COMPANY, et al., Defendants–Appellees, Defendants–Appellants (92–5266).

Nos. 92–5265, 92–5266.

United States Court of Appeals, Sixth Circuit.

Argued Sept. 2, 1993.

Decided June 28, 1994.

John W. Wagster, Hollins, Wagster & Yarbrough, Nashville, TN, Richard H. Adams, Jr. (briefed), Richard D. Connor, Jr. (argued and briefed), Pleus, Adams & Spears, Orlando, FL, for plaintiff-appellant.

Thomas P. Kanaday, Jr., Michael L. Dagley (argued), Farris, Warfield & Kanaday, Nashville, TN, Thomas J. Guilday, M. Kay Simpson (argued and briefed), Huey, Guilday, Kuersteiner & Tucker, Tallahassee, FL, for defendants-appellees.

Kenneth Jones, Sherrard & Roe, Nashville, TN, for Thomas W. Hunter, Maggie Ferguson, Barbara June Hunter, James Knight, Retirement Villages, Inc.

Bryson Hill, Jr., pro se.

Jere R. Lee, Nashville, TN, Richard Montague, Jr., Heidelberg & Woodliff, Jackson, MS, for Buchanan & Co., Inc., Robert Buchanan.

Peggy Newton, St. Petersburg, FL, for J. Milton Newton, Inc.

Robert S. Patterson, Kim A. McMillan, Boult, Cummings, Conners & Berry, Nashville, TN, George E. Mueller, Jr., P.A., George E. Mueller, Jr.

E. Lynn Wagner, C & E Management Co., pro se.

Jere R. Lee, Nashville, TN, Gene D. Berry (briefed), Heidelberg & Woodliff, Jackson, MS, for Richard A. Montague, Jr.

Before: KENNEDY and NORRIS, Circuit Judges; and LIVELY, Senior Circuit Judge.

KENNEDY, Circuit Judge.

We permitted this interlocutory appeal on two issues decided by the District Court on a claim brought under section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b–5, 17 C.F.R. § 240.10b–5. The first issue, appealed by plaintiff Frank Ockerman, is whether the District Court applied the appropriate statute of limitations when it ruled that plaintiff's 10b–5 claim is barred by the statute of repose found in Tennessee's Securities Act of 1980 (also referred to as Tennessee's Blue Sky law). The second issue, appealed by May

Zima & Co., is whether plaintiff is entitled to a presumption of reliance based on a fraud-created-the-market theory and, if so, how such a theory applies to the newly-issued tax-exempt bonds in this case. On appeal, plaintiff argues that (1) the District Court erred by applying Tennessee's Securities Act statute of limitations and repose to the present case rather than Tennessee's statute of limitations for common law fraud; (2) in applying Tennessee's Securities Act, the District Court erred by applying the statute of repose section of the statute as opposed to the limitation period and by failing to equitably toll the running of the statute; and (3) the District Court erred by failing to apply the one year-three year statute of limitations and repose set forth in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 501 U.S. 350, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991). On defendant May Zima & Company's ("May Zima") appeal, it argues that the District Court erred by recognizing a novel fraud-created-the-market theory of reliance.

## I.

The facts as set out by the District Court are as follows.[1] On August 4, 1983, defendants publicly sold Mortgage Revenue Bonds issued by the City of Bowling Green, Kentucky, for $5,500,000.00, the proceeds of which were intended to acquire, construct and equip a retirement village in Bowling Green, Kentucky ("the Project"). Plaintiff purchased $5,000 worth. From the proceeds of the bonds, the promoters succeeded in substantially building and furnishing the Project. Soon thereafter, however, the Project failed. The retirement center never opened for business and never received one deposit. The indenture trustee declared the Project in default in July of 1985, and the partnership that owned the Project filed for bankruptcy on August 30, 1985. In January of 1989, the Project was sold for $1,350,000.00. As of the appeal date, the bondholders had recouped only $485,382.11 of the original $5,500,000.00 investment.

Defendant May Zima was the feasibility consultant for the Project. May Zima prepared the Financial Feasibility Study in which it concluded that the data and assumptions upon which the success of the Project was predicated were reasonable and that the Project would most likely succeed. May Zima had previously provided several health care facilities with auditing, accounting, management consulting and feasibility study services. It appears, however, that many of May Zima's employees who worked on the Project had little or no experience with retirement facilities and the employees who had such experience provided little input into the Bowling Green feasibility study. May Zima's handling of the Bowling Green feasibility study also may have lacked proper oversight or direction.

The chief promoters of the Project, Thomas Hunter and Bryson Hill, were also collaborators in the development of two retirement centers in Hendersonville and Jackson, Tennessee, begun shortly before the Project. The Hendersonville and Jackson projects were substantially identical to the initial plans for the Project. At the time of the Project offering, these other ventures were plagued by marketing failure.

The defendants failed to disclose any of the Hendersonville and Jackson problems to the Project investors. In the literature surrounding the Project offering, Hill was presented as the "money man" in the deal and his companies were to participate as the management and marketing firms for the Project. What was not disclosed was Hill's complete financial status at the time of the offering. Hill had sold a nursing home company for a substantial profit but received from the buyer a long-term promissory note instead of cash. Though Hill's assets were substantial, his commitments of working capital and guarantees to other retirement facilities in which he was involved far outstripped his assets and thereby undermined his purported ability to provide working capital and marketing funds for the Project. In 1984, a

---

1. The issues were decided on summary judgment and the facts are set forth in the light most favorable to plaintiff's position.

year after the bond offering, Hill filed for bankruptcy.

Other shortcomings of the plans for the Project are alleged to include the occupancy projections and the rental rates. As the plans for the Project developed, the promoters and May Zima raised the projected occupancy in the first year from sixty-six percent to seventy percent despite the fact that the Jackson and Hendersonville centers had failed to attract pre-opening subscriptions. The promoters made this projection notwithstanding May Zima's inability to cite a retirement facility that had reached seventy percent occupancy in its first year. The monthly rental rates, as originally planned by Hunter and Hill, were to be $580 for a studio, $630 for a studio deluxe, and $790 for a two bedroom. According to May Zima's research and fieldwork, less than two percent of all apartments in the Bowling Green area charged more than $300 per month and the high rental rates were going to be the greatest obstacle in marketing the facility.

In order to meet financing demands, the promoters raised the proposed monthly rental rates even higher, as disclosed in the final offering circular, to $800 per person for a four person semi-private room, $850 for an efficiency, $900 for a one bedroom, and $975 for a two bedroom. The offering circular indicated that apartments could provide competition for the retirement village units, but failed to disclose the vast difference in rental rates between local apartments and the units at the Project. Prospective residents at the Hendersonville facility had complained of its high rental rates prior to the bond offering for the Project. In addition, financing demands caused the promoters to charge entry fees at all three facilities even before the rent payments began. Even with these obvious obstacles to marketing, the promoters proceeded with the Project.

There was also a disparity between the services and amenities advertised in the offering circular and those that would in fact be available. Further, the consultants on the Project knew that the room sizes resembled a nursing home and were too small for a retirement village.

The promoters also eliminated the Project's nursing service. Originally, the promoters intended to provide the facility's residents with a nurse on location. Kentucky law, however, permits nurses on location only at facilities that obtain a certificate of need. The Project had not done so. The offering circular omitted the fact that the nursing service was cut out shortly before the bond offering. Such a service was important to the viability of a facility that was to charge monthly rental rates in excess of $800 in an area where rental rates rarely exceeded $300.

Similarly, although each living unit was to have a full kitchen, the bond counsel opined that, if the units had kitchens, the bonds would not qualify for tax-exempt status under the Internal Revenue Code. Therefore, the final plans for the Project provided only two hot-plate burners and an under-the-counter refrigerator in only some of the units. The promoters compromised marketability for compliance with the applicable law without reassessing the overall feasibility of the Project.

The promoters also may have purchased more land than was necessary for the Project. The Hendersonville and Jackson facilities had been built upon approximately seven or eight acres, but the Project bought nineteen acres. Although the promoters intended that condominiums or independent living units would be built upon the excess land in the future, they did not disclose this to the investors.

On October 15, 1985, plaintiff filed suit in the District Court for the Middle District of Tennessee, alleging that May Zima's conduct surrounding the sale of the Project bonds was in violation of Section 10(b) of the Securities and Exchange Act of 1934 and Rule 10b–5. Plaintiff, who claims to have read the offering circular, seeks to represent a class of purchasers who, regardless of whether they read the offering circular, assert a fraud on the market theory which would presume reliance. May Zima moved for summary judgment on the ground that plaintiff's claim is barred by Tennessee's Securities Act of 1980 statute of repose and that plaintiff's fraud on the market theory is inapplicable to an initial

offering of bonds in an undeveloped and inefficient market. The District Court ruled for May Zima on the statute of limitations issue and for the plaintiff on the fraud on the market theory.

## II.

Plaintiff asks us to reverse the District Court's ruling that his Rule 10b–5 claim is barred by Tennessee's Securities Act statute of repose.[2] Plaintiff argues that the District Court should have applied Tennessee's three-year statute of limitations for common law fraud, Tenn.Code Ann. § 28–3–105, construed to apply to fraud actions in *Vance v. Schulder*, 547 S.W.2d 927 (Tenn.1977). Alternatively, plaintiff contends that even if Tennessee's Securities Act applies, the District Court should have applied only the one-year statute of limitations and not the two-year repose provision, and should have equitably tolled the running of the limitation period. Finally, plaintiff argues that the District Court erred by failing to apply the one year-three year statute of limitations and repose set forth in *Lampf*, 501 U.S. at 350, 111 S.Ct. at 2773.

In *Lampf*, the Supreme Court held that all actions under section 10(b) and Rule 10b–5 must be brought within one year from the time the fraud was discovered or should have been discovered, but no more than three years from the transaction giving rise to the claim. 501 U.S. at 362–64, 111 S.Ct. at 2782. Plaintiff's claim ordinarily would be subject to the *Lampf* limitations period because the case was pending when *Lampf* was decided. *See James B. Beam Distilling Co. v. Georgia*, 501 U.S. 529, 111 S.Ct. 2439, 115

L.Ed.2d 481 (1991). Under *Lampf*, plaintiff's cause of action against May Zima is not barred by the statute of repose because it was brought within three years from the alleged fraudulent transaction. Plaintiff raises a tolling claim to the one-year statute.

Six months after *Lampf*, however, Congress passed section 27A of the Federal Deposit Insurance Corporation Improvement Act of 1991, Pub.L. No. 102–242, Title IV, § 476, 105 Stat. 2387 (Dec. 19, 1991) (codified at 15 U.S.C. § 78aa–1). This Act purports to prohibit the application of *Lampf* to cases already pending when *Lampf* was decided. Section 27A reads in part:

[a] Effect on Pending Causes of Action. The limitation period for any private civil action implied under § 10(b) of this title that was commenced on or before June 19, 1991, shall be the limitation period provided by the laws applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991.

§ 27A(a), 15 U.S.C. § 78aa–1(a). The instant action was commenced before June 19, 1991 and thus, under the language of section 27A, is subject to the limitations period existing before *Lampf* was decided.

Prior to *Lampf*, this Circuit applied the statute of limitations for state actions most analogous to section 10(b) and Rule 10b–5 actions. *See Carothers v. Rice*, 633 F.2d 7 (6th Cir.1980), *cert. denied*, 450 U.S. 998, 101 S.Ct. 1702, 68 L.Ed.2d 199 (1981). This Court has not decided what Tennessee statute of limitations applies in Rule 10b–5 actions. The language of Tennessee's Securities Act[3] closely follows Rule 10b–5[4] omit-

---

**2.** Tenn.Code Ann. § 48–2–122(h) provides:

No action shall be maintained under this section unless commenced before the expiration of two (2) years after the act or transaction constituting the violation or the expiration of one (1) year after the discovery of facts constituting the violation, or after such discovery should have been made by the exercise of reasonable diligence, whichever first expires.

**3.** Tennessee's Securities Act of 1980 provides:

It is unlawful for any person, in connection with the sale or purchase of any security in this state, directly or indirectly:

(1) To employ any device, scheme or artifice to defraud;

(2) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(3) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.

Tenn.Code Ann. § 48–2–121(a).

**4.** Rule 10b–5 provides in pertinent part:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

ting only the jurisdictional requirement of the federal act that an instrumentality of interstate commerce be used. The elements of common law fraud in Tennessee are also closely analogous to Rule 10b–5.[5] In deciding whether to adopt the Blue Sky statute of limitations or the common law fraud statute in other states in the Circuit, we selected the longer common law statute in Michigan and Ohio and the shorter Blue Sky statute in Kentucky. In Michigan, when the issue was first presented, Michigan's Blue Sky law was very narrow, affording only the remedy of rescission. *Charney v. Thomas*, 372 F.2d 97 (6th Cir.1967). When Michigan broadened its Blue Sky law, we continued to apply the common law fraud statute of limitations because we had been applying it and because we believed that federal securities policy favored a longer statute. *IDS Progressive Fund, Inc. v. First of Michigan Corp.*, 533 F.2d 340 (6th Cir.1976). The reasons for applying the common law fraud statute of limitations in Ohio are somewhat similar. We applied the fraud statute without discussion in the first Ohio decision under Rule 10b–5. *Connelly v. Balkwill*, 279 F.2d 685 (6th Cir.1960). We then continued to apply it because we had applied it, parties may have relied on our prior decision and federal securities policy favored the longer statute. *Nickels v. Koehler Management Corp.*, 541 F.2d 611 (6th Cir.1976), *cert. denied*, 429 U.S. 1074, 97 S.Ct. 813, 50 L.Ed.2d 292 (1977). When the issue was presented from Kentucky, we applied its Blue Sky statute which was, as in Tennessee, virtually identical to Rule 10b–5. *Carothers*, 633 F.2d at 8. Although we noted this Circuit's policy of favoring the longer fraud statute, we concluded that since Kentucky required all securities claims to be brought under its Blue Sky law,

it was the most analogous despite the fact that it was shorter.

■ The Supreme Court in *Lampf*, when deciding which statute of limitations to apply in § 10(b) actions, declined to adopt the longer of two limitations periods. *See Lampf*, 501 U.S. at 361–62, 111 S.Ct. at 2781. The Solicitor General, appearing on behalf of the Securities and Exchange Commission as *amicus curiae*, argued that the five-year period contained in § 20A of the 1934 Act, 15 U.S.C. § 78t–1, which Congress added by the Insiders Trading and Securities Fraud Enforcement Act of 1988, 102 Stat. 4681, provides the best policy and practical results in Rule 10b–5 litigation. After comparing sections 9 and 20A, however, the Court concluded that section 9 is more analogous to section 10(b) and that therefore the applicable limitations period for section 10(b) actions is the one year-three year rule contained in section 9(e) of the 1934 Act, 15 U.S.C. § 78j(e). *See Lampf*, 501 U.S. at 361–62 & 364 n. 9, 111 S.Ct. at 2781 & 2782 n. 9. In determining which section was more analogous to section 10(b), the Court gave no consideration to which section's limitations period was longer. *See id.* at 359–62, 111 S.Ct. at 2780–81; *see also id.* at 377–79, 111 S.Ct. at 2790 (Kennedy, J., dissenting) ("By adopting a 3–year period of repose, the Court ... turns its back on the almost uniform rule rejecting short periods of repose for fraud-based actions.").

Thus, under the Supreme Court's analysis, the length of state statutes of repose is not an important factor when determining which is most analogous to section 10(b). When that consideration is removed, the Tennessee Securities Act of 1980 with its two-year statute of repose is the most analogous. Although common law fraud prohibits fraud generally, the Blue Sky law is specifically

---

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (1990).

**5.** The elements of common law fraud in Tennessee are:

(1) a false misrepresentation

(2) made knowingly, without belief in its truth, or recklessly,

(3) of a material fact,

(4) which induces reasonable reliance, and

(5) which results in damages.

*See Media General, Inc. v. Tanner*, 625 F.Supp. 237, 246–47 (W.D.Tenn.1985).

directed at securities fraud. It is clearly patterned after the federal statute and has the same purpose—to deter fraud in the securities market by requiring full and truthful disclosure. Indeed, most of the district courts in Tennessee have held the Blue Sky law applicable in Rule 10b–5 cases even before *Lampf*.[6] Under that law, which the language of section 27A directs us to apply, plaintiff's claim is untimely because it was brought more than two years from the alleged fraud.

■ We thus have the anomalous situation that plaintiff's claim, which is not barred under *Lampf*, would be barred by a congressional statute passed in order to alleviate the harsh result of applying *Lampf* retroactively. The question is whether section 27A in fact requires this result.

Applying section 27A to plaintiff's claim would violate the clear purpose for which Congress enacted section 27A. The available legislative history on section 27A indicates that the purpose for reinstating pre-*Lampf* limitations periods to pending cases was to prevent the destruction of claims that were timely prior to *Lampf*. *See* Sen.Rep. No. 167, 102nd Cong., 1st Sess.1991, *cited in* 1991 U.S.C.C.A.N.1901. Under pre-*Lampf* law, the two-year repose period of Tennessee's Securities Act statute would extinguish plaintiff's claim, although the claim is timely under *Lampf*. By instructing courts to apply analogous state limitation laws as they had pre-*Lampf*, Congress intended to preserve claims barred by *Lampf* not to extinguish claims permitted by *Lampf*. There is authority that when applying a statute's plain language would reach perverse results, a court will forgo its application in order to achieve the statute's purpose. *See United States v. Underhill*, 813 F.2d 105, 111 (6th Cir.), *cert. denied*, 482 U.S. 906, 107 S.Ct. 2484, 96 L.Ed.2d 376 (1987) ("[I]t is the intention of Congress that controls, and a result contrary to the literal meaning of the words is justified when 'the literal application

of a statute will produce a result demonstrably at odds with the intentions of its drafters....'") (quoting *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 571, 102 S.Ct. 3245, 3250, 73 L.Ed.2d 973 (1982)). We need not decide this issue, however, since there is another reason why *Lampf*'s one year-three year statute of limitations and repose applies in the present case.

■ Due process does not permit application of section 27A to plaintiff's cause of action. Until section 27A became effective, plaintiff's cause of action was timely. Application of section 27A to plaintiff's case would therefore bar the cause of action by shortening the statute of limitations. Congress is without authority to extinguish claims by shortening the statute of limitations unless the prior limitations period has not yet expired and Congress provides a reasonable time in which the plaintiff may file suit. *See Ochoa v. Hernandez Y Morales*, 230 U.S. 139, 161–62, 33 S.Ct. 1033, 1042, 57 L.Ed. 1427 (1913) ("With reference to statutes of limitations, it is well settled that they may be modified by shortening the time prescribed, but only if this be done while the time is still running, and so that a reasonable time still remains for the commencement of an action before the bar takes effect.") (citing *Wilson v. Iseminger*, 185 U.S. 55, 63, 22 S.Ct. 573, 575, 46 L.Ed. 804 (1902); *Wheeler v. Jackson*, 137 U.S. 245, 255, 11 S.Ct. 76, 78, 34 L.Ed. 659 (1890); *McGahey v. State of Virginia (In re Brown)*, 135 U.S. 662, 701, 705, 10 S.Ct. 972, 984, 985, 34 L.Ed. 304 (1890); *Turner v. New York*, 168 U.S. 90, 94, 18 S.Ct. 38, 40, 42 L.Ed. 392 (1897); *Terry v. Anderson*, 95 U.S. 628, 632, 24 L.Ed. 365 (1877)). *See also Block v. North Dakota*, 461 U.S. 273, 286 n. 23, 103 S.Ct. 1811, 1819 n. 23, 75 L.Ed.2d 840 (1983); *Texaco, Inc. v. Short*, 454 U.S. 516, 527 n. 21, 102 S.Ct. 781, 791 n. 21, 70 L.Ed.2d 738 (1981). Congress did not enact section 27A while plaintiff's statute of

---

**6.** *See, e.g., Marcus v. J.D. Bradford Co.*, 1987 WL 49639, at \*2 (E.D.Tenn.1987); *White v. Philatelic Leasing, Ltd.*, 1987 WL 49640 (E.D.Tenn.1987) (the court agrees that the plaintiff's 10b–5 claim is barred by the two-year statute of limitations contained in Tenn.Code Ann. § 48–2–122(h));

*Jones v. Hayden*, 1987 WL 49638 (E.D.Tenn. 1987); *Haney v. Dean Witter Reynolds, Inc.*, 1986 WL 21340 (E.D.Tenn.1986); *Logan v. Ledford*, 699 F.Supp. 141 (M.D.Tenn.1988); *Montcastle v. American Health Sys., Inc.*, 702 F.Supp. 1369 (E.D.Tenn.1988).

limitations was still running; neither did Congress provide plaintiff, in this situation,[7] with the opportunity to file suit in a reasonable time from the enactment of section 27A.

Accordingly, we apply *Lampf*'s statute of repose to the present case and therefore plaintiff's claim against May Zima is not barred by the statute of limitations if tolled. Whether the statute was in fact tolled is not before us in this appeal.

### III.

We turn then to the second question, whether the District Court erred in recognizing a novel fraud-created-the-market theory of reliance. The District Court in denying the defendants' motion for summary judgment held that plaintiff need not prove reliance on defendants' specific statements or omissions in disclosure documents. Instead, the court held that "parts (a) and (c) of Rule 10b–5 are intended to enable a court to presume that the purchaser (or seller) of securities relied on the integrity of the defendants' scheme or course of business in issuing the securities." *Ockerman v. May Zima & Co.*, 785 F.Supp. 695, 703 (M.D.Tenn.1992). The court held that, even if plaintiff did not rely on specific misrepresentations by defendants, he is "presumed to rely on the integrity of the defendants' scheme and course of business in issuing the securities in question." *Id.*

A plaintiff must establish reliance in order to recover in a Rule 10b–5 action. *See Basic, Inc. v. Levinson,* 485 U.S. 224, 243, 108 S.Ct. 978, 989, 99 L.Ed.2d 194 (1988). The purpose of requiring reliance is to establish a causal connection between the defendants' alleged fraud and the plaintiff's decision to purchase the security. The plaintiff must usually prove direct reliance on a defendant's misrepresentations or failure to disclose. In certain situations, however, reliance may be presumed. One such situation involves the "fraud on the market" theory:

> The fraud on the market theory is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements. . . . The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.

*Peil v. Speiser,* 806 F.2d 1154, 1160–61 (3d Cir.1986) (citation omitted), *cited in Basic,* 485 U.S. at 241–42, 108 S.Ct. at 989. The fraud-on-the-market presumption is based on three factual premises. First, in a developed market, sophisticated financial professionals can generally be expected to read the publicly available information about a security. Second, their competing evaluations will affect the security's price. Third, unsophisticated investors generally rely on a security's market price as reflecting the security's value. Thus, if disclosure documents contain material misrepresentations, the security's price will be affected through market professionals, and investors, relying on the price, rely indirectly on the disclosure documents whether or not they have actually read them. The Supreme Court endorsed the fraud on the market theory in *Basic.*

This Circuit has held that the fraud on the market presumption of reliance does not apply when securities are not traded on an efficient market, as is the case with new issues. *Freeman v. Laventhol & Horwath,* 915 F.2d 193 (6th Cir.1990). Holding that

---

**7.** § 27A does permit plaintiffs to file suit when their claims were dismissed as a result of *Lampf:*

> (b) Effect on dismissed causes of action
> Any private civil action implied under section 78j(b) of this title that was commenced on or before June 19, 1991—
> (1) which was dismissed as time barred subsequent to June 19, 1991, and
> (2) which would have been timely filed under the limitation period provided by the laws

applicable in the jurisdiction, including principles of retroactivity, as such laws existed on June 19, 1991, shall be reinstated on motion by the plaintiff not later than 60 days after Dec. 19, 1991.
15 U.S.C. § 78aa–1(b). This fact lends further support to our conclusion that § 27A was intended to protect plaintiffs whose claims were barred by *Lampf.* Congress failed to provide any protection to plaintiffs whose claims were timely under *Lampf* but which were barred by § 27A.

the court will presume reliance only when it is logical to do so, the *Freeman* court pointed out that "[a]n inefficient market, by definition, does not incorporate into its price all the available information about the value of a security." *Id.* at 198. The court then held that a primary market for newly issued municipal bonds is not an efficient market.

■ In face-to-face transactions, reliance on a defendant's failure to disclose material information may also be presumed where the defendant had a duty to disclose. Thus, reliance was presumed in *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 152–54, 92 S.Ct. 1456, 1471–72, 31 L.Ed.2d 741 (1972). There the bank and its employees, who created a market in shares in partitional assets of the Ute tribe and who were acting on behalf of the mixed-blood sellers, failed to disclose the market price being paid to others for shares and bought shares from plaintiff for themselves. Logic and common sense tells us that the sellers would rely on those acting on their behalf and if the facts withheld from them were those a reasonable investor would consider, their loss was caused by the failure to disclose.

■ A second theory of reliance on the market, a fraud *created* the market theory, has been applied in other circuits to newly-issued securities traded on an undeveloped market. The difficulty with this latter theory is that a newly-issued security's price is not set by the market and its price does not reflect all available public information about the investment value of the security. Rather, the security's price is set by the primary participants in the enterprise, *e.g.,* the promoters, issuers and underwriters. These participants usually have interests different from or contrary to those of investors and their valuations, therefore, may not correspond with the security's true market value. The fraud-created-the-market theory appears to be at odds with our decision in *Freeman.* In some situations, however, other circuits have recognized a theory of recovery on newly-issued securities if the plaintiffs demonstrate that but for defendant's fraud the security would not have been marketed and that the plaintiffs relied on the market to produce marketable securities. *See, e.g.,*

*Ross v. Bank South, N.A.,* 885 F.2d 723 (11th Cir.1989) (en banc), *cert. denied,* 495 U.S. 905, 110 S.Ct. 1924, 109 L.Ed.2d 287 (1990); *T.J. Raney & Sons, Inc. v. Fort Cobb, Okla. Irrigation Fuel Auth.,* 717 F.2d 1330 (10th Cir.1983), *cert. denied,* 465 U.S. 1026, 104 S.Ct. 1285, 79 L.Ed.2d 687 (1984); *Shores v. Sklar,* 647 F.2d 462 (5th Cir.1981) (en banc), *cert. denied,* 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983).

The Fifth Circuit accepted the fraud-created-the-market theory in *Shores v. Sklar,* 647 F.2d 462 (5th Cir.1981), *cert. denied,* 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983). *Shores* involved a class action brought against all participants in the issuance of revenue bonds, the proceeds of which were to be used to construct a mobile home manufacturing plant in Frisco City, Alabama. The bonds, which were to be repaid by the sales proceeds of the mobile homes, were rendered worthless as a result of the developer-lessee's almost immediate default on the rent. Plaintiff alleged that defendants engaged in a fraudulent scheme to induce a municipality to issue, and the public to buy, otherwise unmarketable bonds. Plaintiff had not read or relied on the offering circular, but instead had relied exclusively on his broker's recommendation to invest in tax-free industrial bonds.

Concerning the reliance issue, the court stated that:

> Whenever the rule 10b–5 issue shifts from misrepresentation or omission in a document to fraud on a broader scale, the search for causation must shift also. The "reliance" that produces causation in the latter type of case cannot come from reading a document. It may arise from the duty to speak ..., a scheme to manipulate the market at a time when a merger had forced a sale ..., a scheme to inflate common stock prices by misleading statements ..., or a claim by a bond buyer that he relied on the market to provide securities that were not fraudulently created....

*Shores,* 647 F.2d at 472 (citations omitted). Thus, the Fifth Circuit endorsed the fraud-created-the-market theory as it applies to an initial offering of industrial bonds. In essence, the court held that investors should be

able to rely on the fact that local governments would not authorize, underwriters would not finance and brokers would not offer to sell bonds they knew were unmarketable.

One difficulty in applying the fraud-created-the-market theory is defining *unmarketable*. There are at least two possibilities. One view, *economic unmarketability*, holds that a security is unmarketable if no investor would buy it because, assuming full disclosure, the security is patently worthless. Second, a security is *legally unmarketable* if, absent fraud, a regulatory agency or the issuing municipality would have been required by law to prevent or forbid the issuance of the security. Under both theories of unmarketability, it is argued that the investment decision is caused by fraud because but for the fraud, the security could not have been proposed, issued, or sold.

In this case, in terms of economic marketability, the District Court stated that if the *Shores* test were applied, the court would probably find that the Project bonds were not unmarketable but for defendants' alleged fraud. The court reasoned that because several deficiencies in the Project were disclosed, including the extremely high rental rates, and still the bonds were marketed, the deficiencies concerning other aspects of the Project would not have made the bonds unmarketable. Initially, we question the validity of the fraud created the market theory. Under the fraud on the market theory recognized in *Basic*, an investor is presumed to rely on the disclosure documents because experience informs us that, in a developed market, sophisticated financial experts will have read the documents and affected the price. The plaintiff-investor, by relying on the price, relies on these third persons' reading of disclosure documents. As we held in *Freeman*, with newly-issued securities, investors in new securities do not generally rely on the research of other investors to fix the price, at least not to the extent that would justify adopting a presumption. For one thing, there are no investors between the

primary sellers and the plaintiff on whom to rely. Nor would it be reasonable for plaintiff and plaintiff-class to rely on other similarly situated investors, who purchased the bonds contemporaneously with plaintiff, to examine the disclosure documents given that plaintiffs themselves did not rely on the documents.

For several reasons, however, we need not decide whether a purchaser of newly-issued securities is ever entitled to rely on a fraud created the market theory. First, plaintiff's Complaint has not alleged any fraud by May Zima except in the offering statements. Second, a theory of economic unmarketability requires that the securities be patently worthless. Only then could plaintiff reasonably infer anything about the value of the bonds from the fact that other investors have bought them, namely, that the bonds were worth buying at some price. There is no basis for finding that the bonds were completely worthless. The Project was developed and later sold, although at a substantial loss. Plaintiff seems rather to claim that the bonds were not worth the price he paid for them. The Complaint alleges that the Official Statement failed to clearly state the "high risk nature of the investment" and that the true value of the bonds was "substantially less than the price paid for them by Plaintiff and the class," not that the Official Statement failed to disclose facts demonstrating the investment's worthlessness. Thus, the economic unmarketability theory would not be available to plaintiff because he has failed to allege reliance on the fact of purchases by others or that the bonds were patently worthless.

Nor does plaintiff claim that the bonds were legally unmarketable. He does not claim that defendants made misrepresentations or omissions to the issuing municipality or to a regulatory agency such that, had full disclosure been made, the governmental entity would have been required by law to deny the bonds' issuance.[8] We find only one allegation in the Complaint that suggests such a theory. Plaintiff alleged that "the Official Statement also omits to state that the Pro-

---

**8.** Without such facts before us, however, we cannot say whether any set of circumstances would justify a presumption of reliance.

ject was planning to skirt the licensing requirements under Kentucky law relating to obtaining a certificate of need." Specifically, plaintiff claims that defendants planned to employ a resident nurse, which would require a certificate of need, although such certificates were unavailable at that time. This might suggest that the Official Statement concealed the nature of the services to be provided at the Project such that, had they been fully disclosed, the proposed Project would have clearly been unlawful and, therefore, the municipality would have refused to issue the bonds. The allegation goes on to state, however, that the fraud relating to the certificate of need was the Official Statement's failure to state the penalties that the Project could be subjected to if it were found to be in violation of licensing requirements, not that the Statement failed to disclose an intention to provide nursing service.

In addition, plaintiff cannot claim that the bonds were issued illegally because an important factor contributing to the Project's failure was the lack of nursing service, not the unlawful provision of such service. It was in part the Project's compliance with licensing requirements, by not providing nursing service, that made the rental rates too high to attract tenants. Thus the record does not support a claim that the bonds were legally unmarketable. We agree with the District Court that the economic marketability theory is inapplicable under the facts of this case. Thus, we neither adopt nor reject that theory since to do so would be advisory. We conclude, therefore, that a presumption of reliance based on a fraud created the market theory of the Fifth and Eleventh Circuits is unavailable to plaintiff in this case.

■ We then turn to the District Court's theory that subsections (a) and (c), which provide that "(a) to employ any device, scheme or artifice to defraud," and "(c) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security," permit the court to presume that a purchaser relied on the integrity of defendants' scheme or course of business in issuing the securities. The court acknowledged

that this reasoning greatly diminishes the importance of the reliance element in 10b–5 securities fraud litigation since any claimant will contend that they relied on not only the defendants' misrepresentations but also upon the integrity of the course of business taken by the defendant promoters and professionals. Nevertheless, the Court believes that this reasoning to be [sic] more in line with the language and intent of Rule 10b–5 than the reasoning in *Shores,* and that its holding will enable courts to make fair evaluations about just liability for fraudulent securities schemes instead of applying the less accurate *Shores* test and attempting to evaluate something so esoteric as when a security would be unmarketable but for the alleged fraudulent scheme.

785 F.Supp. at 703 (footnote omitted). This presumption is rebuttable, the court stated, if

defendants show that plaintiffs intentionally refused to investigate in disregard of a risk known to him or so obvious that the plaintiffs must be taken to have been aware of it, and so great as to make it highly probable that harm would follow. Thus, defendants could rebut the presumption by showing plaintiff intentionally refused to investigate the defendants who he should have known were essentially crooked.

785 F.Supp. at 703 n. 9 (citation omitted). Since plaintiff did not allege "any devise, scheme or artifice to defraud," aside from the prospectus, subsection (a) does not appear to contribute anything not contained in subsection (b). Nor is there any act, practice or course of business by defendant May Zima which is alleged to be fraudulent except the disclosure or the failure to disclose information in the prospectus.

The fundamental purpose of the Act is to implement a philosophy of full disclosure. *Basic,* 485 U.S. at 230, 108 S.Ct. at 982. The Court has also made clear that reliance either on false disclosure or the failure to disclose is an element of a Rule 10b–5 cause of action. *Id.* at 243, 108 S.Ct. at 989 ("Reliance provides the requisite causal connection between a defendant's misrepresentation and a plaintiff's injury."). The District

Court's theory reads reliance out of the Rule 10b–5 implied cause of action. No court has done so. As noted by Justice White in his dissent in *Basic*, the Court rejected the fraud on the market theory, "heretofore adopted by some courts, which equates 'causation' with 'reliance,' and permits recovery by a plaintiff who claims merely to have been *harmed* by a material misrepresentation which altered a market price, notwithstanding proof that the plaintiff did not in any way *rely* on that price." *Id.* at 251, 108 S.Ct. at 993–94. We need to keep in mind that Rule 10b–5 is concerned with disclosure and the use of the mail, a national security exchange or an instrumentality of commerce—and the prospectus is claimed by plaintiff to be what was used. We see no justification for reading reliance out of Rule 10b–5 and creating a new implied cause of action which amounts to investor's insurance.

In this case, the allegations in the Complaint all relate to alleged omissions and misrepresentations contained in the Official Statement and other documents attached thereto. As such, the theory of the District Court that permits plaintiff to rely on defendants' overall scheme or course of business to recover under Rule 10b–5 is misplaced. Rather, the fraud of May Zima that plaintiff must prove caused his investment decision is limited to the content of the disclosure documents. Plaintiff and members of the class must prove reliance on those documents.

### IV.

We **REMAND** this case for further proceedings not inconsistent with our resolution of the certified questions.